1  ADLESON, HESS & KELLY, APC
Randy M. Hess, Esq. (SBN 88635)
2  Nicole S. Adams-Hess, Esq. (SBN 286632)
577 Salmar Avenue, Second Floor
3  Campbell, California 95008
Telephone: (408) 341-0234
4  Facsimile: (408) 341-0250
rhess@ahklaw.com
5  nhess@ahklaw.com

6  Attorneys for Defendant/Counterclaimant
INB INSURANCE SERVICES CORPORATION
7

8              UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

10

11  GENERAL INSURANCE COMPANY OF          Case No:      3:18-cv-03372-JST
AMERICA,
12                                        DECLARATION OF NICOLE S. ADAMS-
              Plaintiff,                   HESS IN SUPPORT OF DEFENDANT INB
13                                        INSURANCE SERVICES CORPORATION'S
vs.                                       SUPPLEMENTAL OPPOSITION TO
14                                        PLAINTIFF'S MOTION FOR SUMMARY
INB INSURANCE SERVICES                    JUDGMENT AND FED. R. CIV. PROC. R.
15  CORPORATION,                          56(f) REQUEST FOR SUMMARY
                                          JUDGMENT IN FAVOR OF NONMOVANT
16              Defendant.                 INB INSURANCE SERVICES
                                          CORPORATION
17
                                          Date:      No Hearing Set
18                                        Place:     450 Golden Gate Avenue
                                                     Courtroom 9, 19th Floor
19                                                   San Francisco, CA 94102
                                          Judge:     Hon. Jon S. Tigar
20

21       I, Nicole S. Adams-Hess, declare as follows:

22       1.      I am an attorney duly licensed to practice before all the courts of the State of

23  California and am a member in good standing of the Bar of this Court. I am an attorney with

24  the firm of Adleson, Hess & Kelly, P.C., attorneys of record for defendant INB Insurance

25  Services Corporation ("INB") herein. I make this declaration in support of INB's supplemental

26  opposition to plaintiff's Motion for Summary Judgment and INB's Federal Rules of Civil

27  Procedure Rule 56(f) request for summary judgment in favor of INB. I have personal knowledge

28  of the matters averred in this declaration, and if called to testify with respect thereto, could and

ADLESON, HESS &
KELLY, APC
577 SALMAR AVE., 2D FL.
CAMPBELL, CA 95008
(408) 341-0234
FAX (408) 341-0250
WWW.AHK-LAW.COM

Case No: 3:18-cv-03372-JST        ADAMS-HESS DEC IN OPPOSITION TO GICA MSJ; ISO RULE 56(f) REQUEST        Page 1

1  would do so competently under oath.

2      2.      Attached to this declaration as Exhibit "A" is a true and correct copy of the

3  operative Second Amended Complaint filed in the action entitled *West Overland, LLC v.*

4  *Travelers Casualty Insurance Company of America, and INB Insurance Services Corp.*, Case

5  No. RG16837763, currently pending in the Superior Court of the State of California, County of

6  Alameda. I personally downloaded a copy of the Second Amended Complaint from the

7  Alameda County Superior Court website.

8      3.      Attached to this declaration as Exhibit "B" is a true and correct copy of the cited

9  pages from the deposition of Charles Andrist taken in the Underlying Action.

10     4.      Attached to this declaration as Exhibit "C" is a true and correct copy of the cited

11 pages from the deposition of Craig Hulse taken in the Underlying Action.

12     5.      Attached to this declaration as Exhibit "D" is a true and correct copy of the cited

13 pages from the deposition of Jennifer Chen taken in the Underlying Action.

14     6.      I have personally reviewed the underwriting file produced by plaintiff's counsel.

15 There is nothing in the produced underwriting file that shows any intent by the parties to exclude

16 coverage for claims by West Overland or for the Underlying Action. I have also personally

17 reviewed the 2017-2018 professional liability policy attached to plaintiff's declaratory relief

18 complaint. There is nothing in the 2017-2018 policy that contains any specific endorsement or

19 limitation excluding coverage for claims by West Overland, or claims related to the policies

20 issued to West Overland.

21     I declare under penalty of perjury under the laws of the United States of America that

22 the foregoing is true and correct. Executed this 18th day of January 2019, at Campbell,

23 California.

24

25                                                    _____

26                                                    Nicole S. Adams-Hess

27

28

ADLESON, HESS &
KELLY, APC
577 SALMAR AVE., 2D FL.
CAMPBELL, CA 95008
(408) 341-0234
FAX (408) 341-0250
WWW.AHK-LAW.COM

# EXHIBIT "A"

**FILED BY FAX**
ALAMEDA COUNTY

November 06, 2017

CLERK OF
THE SUPERIOR COURT
By Burt Moskaira, Deputy

CASE NUMBER:
**RG16837763**

1   Ivo Labar (203492)
    labar@kerrwagstaffe.com
2   Daniel J. Veroff (291492)
    veroff@kerrwagstaffe.com
3   **KERR & WAGSTAFFE LLP**
    101 Mission Street, 18th Floor
4   San Francisco, CA 94105–1727
    Telephone: (415) 371-8500
5   Fax: (415) 371-0500

6   Attorneys for Plaintiff
    WEST OVERLAND LLC

7

8               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                           **COUNTY OF ALAMEDA**

10

11  | WEST OVERLAND LLC, a California limited | Case No. RG16837763 |

WEST OVERLAND LLC, a California limited
liability company,

Plaintiff,

v.

TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA, a Connecticut
corporation; and INB INSURANCE
SERVICES CORP., a California corporation,

Defendants.

Case No. RG16837763

**SECOND AMENDED COMPLAINT
FOR:**

**(1) PROFESSIONAL NEGLIGENCE;
(2) PROFESSIONAL NEGLIGENCE;
(3) NEGLIGENT
MISREPRESENTATION;
(4) FRAUD;
(5) FRAUD;
(6) REFORMATION;
(7) REFORMATION;
(8) VIOLATION OF BUSINESS AND
PROFESSIONS CODE SECTION 17200;
(9) VIOLATION OF BUSINESS AND
PROFESSIONS CODE SECTION 17200;
(10) BREACH OF CONTRACT;
(11) BREACH OF CONTRACT;
(12) BAD FAITH;
(13) BAD FAITH;
(14) TORT OF ANOTHER**

**JURY TRIAL DEMANDED**

KERR
—— & ——
WAGSTAFFE
LLP

**PARTIES**

1.      Plaintiff West Overland LLC ("WEST OVERLAND") is a limited liability company organized under the laws of the State of California with its principal place of business in the State of California.

2.      Defendant Travelers Casualty Insurance Company of America ("TRAVELERS") is an insurance company incorporated under the laws of the State of Connecticut with its principal place of business in the State of Connecticut. TRAVELERS underwrites insurance policies in California.

3.      Defendant INB Insurance Services Corp. ("INB") (collectively with TRAVELERS, "DEFENDANTS") is an insurance agency incorporated under the laws of the State of California with its principal place of business in the State of California.

4.      PLAINTIFF is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint, each Defendant was an agent, servant, manager, employee, co-conspirator, and/or joint venturer of the other Defendant, and was at all times acting within the course and scope of that agency, service, management, employment, co-conspiracy and/or joint venture.

**VENUE**

5.      Venue is appropriate in Alameda County because the acts that give rise to this action occurred there.

6.      Venue is also appropriate in Alameda County because DEFENDANTS are individuals, partnerships, or corporations that are either authorized to conduct, or, in fact, do conduct substantial business in the State of California, County of Alameda.

**FACTUAL ALLEGATIONS**

**THE REQUEST FOR INSURANCE**

7.      In or about 2007, the property located at 1000-1036 Apgar Street, known City Crossing, was constructed.  It includes 19 new single family residential townhouse units in four standalone buildings (the "PROPERTY").  Each building/unit was three stories tall.

8.      In or about June 2009, WEST OVERLAND purchased the PROPERTY and

1

1   before closing, was required to obtain a property insurance policy to cover it against risk of loss

2   or damage due to fire, amongst other things.

3        9.    To accomplish this, WEST OVERLAND approached INB to buy from it a

4   property insurance policy that would cover WEST OVERLAND for any damage or loss to the

5   buildings and personal property within them, reimburse it for expenses incurred to restore the

6   buildings after a loss, and pay for lost income during repairs. INB agreed to sell a policy

7   matching this request, and represented orally and in writing that it was an insurance agency.

8        10.   INB then began seeing if it could write the insurance with two admitted insurance

9   carriers. INB was an agent for these carriers and appointed as such through the California

10  Department of Insurance. It had an agency contract for each of these carriers. One of them was

11  TRAVELERS. INB could have selected numerous other carriers, but selected these two because

12  as their agents INB would earn commission and bonuses through their agency compensation

13  agreements. INB also put surplus brokers on notice of the potential need for a surplus market

14  policy in case the admitted insurers could not insure WEST OVERLAND.

15       11.   To see if it could write the insurance for Travelers, INB needed to know if the

16  PROPERTY was sprinklered or not. WEST OVERLAND did not know, and referred INB to the

17  builder, who informed INB that only two units were sprinklered. INB wrote that information

18  down and shared it with a direct employee of TRAVELERS telephonically, if not by fax as well.

19  INB also faxed TRAVELERS photographs showing there were no sprinklers in multiple units.

20       12.   INB has a contractual right to apply for and solicit insurance on behalf of

21  TRAVELERS through its agency contract. TRAVELERS fulfilled that contractual agency duty

22  here by filling out a paper application, submitting it to TRAVELERS, and asking TRAVELERS

23  if it could bind the insurance. TRAVELERS told INB to instead use its new electronic quote-to-

24  issue system, IENET. IENET allows agents to input data they collect from customers into a

25  computer and underwrite the insurance themselves if the insured risk is within that specific

26  agent's level of authority as granted by TRAVELERS. INB did that here, however, when it got

27  to a computer screen asking for information on the first of four buildings of the PROPERTY,

28  INB clicked a box for "sprinkled." INB checked that box for each of the four buildings even

1 though only two units out of four buildings had sprinklers. Notably, there was no way to

2 indicate in this system whether a building was only partially sprinklered or what percent.

3       13.    Thereafter, TRAVELERS and INB presented WEST OVERLAND with a

4 proposal for coverage. The proposal did not indicate in any way that as a condition of coverage,

5 WEST OVERLAND was required to maintain active fire sprinklers in all units. Upon reviewing

6 this proposal, WEST OVERLAND asked INB to bind coverage, and INB agreed to do so. INB

7 then issued a binder of coverage and represented to WEST OVERLAND it was consistent with

8 WEST OVERLAND's request for insurance. At the same time, INB caused TRAVELERS to

9 automatically issue the POLICY it was within INB's authority.

10 **THE POLICY**

11       14.    TRAVELERS thus issued WEST OVERLAND policy number 680-7220N517

12 (the "POLICY"), which purports to provide $4,500,000 of coverage for first party property

13 claims, with a $2,500 deductible, covering damage to buildings, repair costs, loss of income, and

14 personal property damage resulting from numerous causes including fire. The POLICY also

15 provides third-party commercial general liability coverage.

16       15.    When issuing the POLICY, TRAVELERS stated, in writing, "Travelers is

17 providing you the peace of mind and stability that over half a million American business owners

18 rely on every day. We are glad to be providing you with the thorough protection and superior

19 service that your business deserves."

20       16.    The POLICY contains numerous pages, forms, and added endorsements. Early in

21 the POLICY, there is a form titled "**COMMON POLICY CONDITIONS.**" The title appears in

22 extra-large font. It states, "All Coverage Parts included in this policy are subject to the following

23 conditions," and proceeds to list various coverage conditions. It says nothing about fire

24 sprinklers. There is a notation at the end of this section, in normal sized, unbolded, uncapitalized

25 font that states, "This policy consists of the Common Policy Declarations and the Coverage

26 Pages and endorsements listed in the declarations form." It does not say that any of these forms

27 contain additional conditions of coverage.

28       17.    A few pages later there is a table of contents that lists the sections applicable to

3
SECOND AMENDED COMPLAINT

1    the first-party coverage section. The table of contents clearly lists where the "EXCLUSIONS"

2    and "PROPERTY LOSS CONDITIONS" can be found. On the pages for "EXCLUSIONS" and

3    "PROPERTY LOSS CONDITIONS," these terms appear in bold and capitalization. There is

4    nothing about fire sprinklers. Neither of these sections indicate that additional exclusions or

5    conditions may be listed in the endorsements.

6         18.    Further, there is no notification in the table of contents of any section that shows

7    where an insured can find any conditions precedent to coverage. The table of contents does

8    contain a warning that it does not identify any endorsements that may be attached. But, it does

9    indicate that endorsements could contain coverage limiting provisions, and this warning is not in

10   large, capitalized or bolded font.

11                   **THE PROTECTIVE SAFEGUARDS ENDORSEMENT**

12        19.    Approximately 50 pages later, several endorsements are attached, including one

13   titled, "PROTECTIVE SAFEGUARDS ENDORSEMENT FOR SPRINKLERED LOCATIONS

14   AND RESTAURANTS" (the "PROTECTIVE SAFEGUARD ENDORSEMENT" OR "PSE.")

15   The PSE purports to add two separate provisions to the POLICY. The first section, which is not

16   added to any section of the POLICY that would alert an insured it contains a coverage-limiting

17   provision such as the EXCLUSIONS section, states as follows:

18            1.   The following is added to the:

19                 BUSINESSOWNERS PROPERTY COVERAGE

20                 SPECIAL FORM

21                 BUSINESSOWNERS PROPERTY COVERAGE STANDARD FORM

22                 **PROTECTIVE SAFEGUARDS**

23            a.   As a condition of this insurance, you are re-

24                 quired to maintain the protective devices listed in the Schedule above.

25            b.   The protective safeguards to which this en-

26                 dorsement applies are identified by the following symbols:

27                 **"P-1" Automatic Sprinkler System**, includ-

28                 ing related supervisory services.

4

1            Automatic Sprinkler System means:

2                  (1) Any automatic fire protective or extinguishing system,

3                    including connected:

4                          (a) Sprinklers and discharge

5                            nozzles;

6                          (b) Ducts, pipes, valves and fit-

7                            ings;

8                          (c) Tanks, their component parts

9                            and supports; and

10                         (d) Pumps and private fire pro-

11                           tection mains.

12                   (2) When supplied from an automat-

13                    ic fire protective system:

14                         (a) Non-automatic fire protective

15                            systems; and

16                         (b) Hydrants, standpipes and

17                            outlets.

18            "P-9" Protective system covering cooking surface as described in

19            application for insurance on file with company

20    20.     The second states as follows:

21       2.    The following is added to the EXCLUSION sec-

22          tion of:

23          BUSINESSOWNERS PROPERTY COVERAGE

24          SPECIAL FORM

25          BUSINESSOWNERS PROPERTY COVERAGE

26          STANDARD FORM

27          We will not pay for loss or damage caused by or

28          resulting from fire, if, prior to the fire, you:

1     a. Knew of any suspension or impairment in any

2       protective safeguard listed in the Schedule

3       above, and failed to notify us of that fact; or

4     b. Failed to maintain any protective safeguard

5       listed in the Schedule above, over which

6       you had control, in complete working order.

7       If part of the Automatic Sprinkler System is shut

8       off due to breakage, leakage, freezing conditions

9       or opening of sprinkler heads, notification to us

10      will not be necessary if you can restore full

11      protection within 48 hours.

12   21.  Accordingly, the PSE appears to contain two provisions, one which is generally

13 added to the BUSINESSOWNERS PROPERTY COVERAGE SPECIAL FORM and

14 BUSINESSOWNERS PROPERTY COVERAGE STANDARD FORM, and one that is

15 specifically added to the EXCLUSION section of these forms. Notably, TRAVELERS would

16 still have issued the POLICY, simply without the PSE, if INB had not checked the boxes in

17 IENET for "sprinklered," and/or if TRAVELERS would have taken reasonable care and noticed

18 the inconsistent information. That is because TRAVELERS does not require apartment

19 buildings under six stories to be sprinklered.

20   **DELIVERY OF THE POLICY AND RENEWALS BEFORE THE FIRES**

21   22.  Upon delivery of the POLICY, INB represented to WEST OVERLAND that

22 coverage was immediately in effect and did not disclose to WEST OVERLAND the existence of

23 the PSE. For example, it wrote, "Enclosed please find a copy of revised certificate of insurance

24 showing the coverages you currently have with our agency," which was followed by pages

25 showing the coverage types and limits but not the PSE or its terms.

26   23.  TRAVELERS and INB also both knew that TRAVELERS interpreted the PSE as

27 requiring an insured to have at least eighty percent (80%) of a building protected by fire

28 sprinklers before coverage would ever become effective, and if not, to *install* new fire

1    sprinklers—even though the endorsement clearly did not say that.

2       24.    As the POLICY was set to auto-renew every year, WEST OVERLAND was not

3    asked to submit new information at each renewal.

4    <u>**TRAVELERS REALIZES THE PSE IS VAGUE, AMBIGUOUS, UNCLEAR, AND**</u>

5    <u>**CERTAINLTY DOES NOT APPLY TO BUILDINGS THAT DO NOT HAVE**</u>

6    <u>**SPRINKLERS (LIKE WEST OVERLAND'S)**</u>

7       25.    In or around 2015, TRAVELERS internally realized that the PSE – a standard

8    form – is wholly inapplicable to buildings that do not have sprinklers. As is clear from the title

9    of the PSE, it is only "for *sprinkled* properties and restaurants," not "for *sprinklered* properties,

10   *non-sprinklered* properties, and restaurants." The PSE also does not state it requires

11   policyholders to add fire sprinklers where they do not exist; it states it requires insureds to

12   "maintain" systems and warns about what happens when systems are "suspended" or "impaired."

13   Something that does not exist clearly cannot be maintained, suspended or impaired.

14   Additionally, the PSE does not say how it applies if a building never had sprinklers. (To the

15   extent there is any argument that the PSE does indicate it requires insureds to install new

16   sprinklers, the above-mentioned language renders it hopeless ambiguous).

17      26.    TRAVELERS, knowing of these problems with the PSE, developed a plan to

18   ensure *its position* that the PSE requires 80% of a property to be sprinklered, even if it never had

19   any sprinklers, was clearly communicated. *First,* it updated IENET so that when an agent

20   clicked the button for "sprinklered" during the initial application, a box for the percentage would

21   come up. *Second,* a dialogue would then come up telling the agent that it had a duty to inform

22   the insured of the company's position on what the PSE means, and requiring the agent to click a

23   box agreeing that they had done so. This is extremely uncommon as insurance policies are

24   binding contracts; there is no need to make an insured confirm they agree to what the policy

25   says—unless, of course, the policy is ambiguous or has some other problem rendering it

26   uneforcaeble. *Third,* TRAVELERS developed a cautionary form to be sent to insureds on every

27   annual policy renewal thereafter, which stated TRAVELRES' interpretation of the PSE in

28   extreme detail in all bold and capitalized letters. The form clearly states that it *must* be signed by

7

1  the insured and returned for a policy to renew. TRAVELERS generated this form for WEST

2  OVERLAND in 2015 and 2016 but never sent it.

3      27.    Notably, these IENET changes caused massive problems for WEST OVERLAND

4  and other insureds. For policies entered before the system change, if the box for sprinklered was

5  clicked, the new system automatically translated that to 100% sprinklered even though they

6  might not be. As explained below TRAVELERS based its denial in part on these screens. There

7  is no telling how many other insureds TRAVELERS have harmed through this.

8                          <u>**THE FIRST FIRE CLAIM**</u>

9      28.    On or about July 6, 2016, a fire broke out at a construction site adjacent to the

10  PROPERTY. The fire spread to the PROPERTY, causing extensive damage to two of the four

11  buildings (the "LOSS.") WEST OVERLAND filed an insurance claim with TRAVELERS

12  under the POLICY for damage to the buildings, loss of income, and more (the "CLAIM.")

13  Thereafter, INB repeatedly assured WEST OVERLAND that the POLICY covered the CLAIM.

14      29.    TRAVELERS sought to avoid paying the CLAIM. By way of a reservation of

15  rights letter dated July 18, 2016, TRAVELERS stated that during a post-LOSS investigation of

16  the PROPERTY taking place on or about July 11, 2016, it learned, to its (feigned) surprise, that

17  the PROPERTY lacked fire sprinklers. TRAVELERS concluded that it needed more time to

18  investigate the CLAIM based on the PROTECTIVE SAFEGUARDS ENDORSEMENT.

19      30.    Having heard nothing, on or about September 20, 2016, WEST OVERLAND

20  requested that, pursuant to California Insurance Code section 2071, TRAVELERS provide

21  WEST OVERLAND with a copy of all CLAIM-related documents. Section 2071 provides as

22  follows:

23          a.  "The insurer shall notify every claimant that they may obtain, upon

24              request, copies of claim-related documents. For purposes of this section,

25              'claim-related documents' means all documents that relate to the

26              evaluation of damages, including, but not limited to, repair and

27              replacement estimates and bids, appraisals, scopes of loss, drawings,

28              plans, reports, third-party findings on the amount of loss, covered

                                    8

1            damages, and cost of repairs, and all other valuation, measurement, and

2            loss adjustment calculations of the amount of loss, covered damage, and

3            cost of repairs. However, attorney work product and attorney-client

4            privileged documents, and documents that indicate fraud by the insured or

5            that contain medically privileged information, are excluded from the

6            documents an insurer is required to provide pursuant to this section to a

7            claimant. Within 15 calendar days after receiving a request from an

8            insured for claim-related documents, the insurer shall provide the insured

9            with copies of all claim-related documents, except those excluded by this

10            section."

11      31.     Having received no response for nearly a month, on or about October 12, 2016,

12 WEST OVERLAND again asked for an update on the CLAIM status and the request for the file.

13      32.     Nine days later, on October 21, 2016, TRAVELERS responded stating that "our

14 internal coverage review is still ongoing." Five days later, by way of letter dated November 8,

15 2016, TRAVELERS formally denied the CLAIM, contending that WEST OVERLAND

16 breached the condition precedent to coverage that requires WEST OVERLAND to "maintain"

17 sprinklers throughout the PROPERTY, on the grounds that they were never installed. In doing

18 so, TRAVELERS misrepresented that the PSE added this condition precedent to the

19 EXCLUSIONS section of the POLICY, when it clearly by its own terms did not.

20      33.     Thereafter, WEST OVERLAND contacted TRAVELERS. TRAVELERS

21 represented that WEST OVERLAND misrepresented on the application for insurance that the

22 PROPERTY was fully sprinklered in all units. When WEST OVERLAND asked for a copy of

23 that application, TRAVELERS refused to provide it. WEST OVERLAND never made any

24 misrepresentation.

25      34.     Apparently, TRAVELERS was referring not to any application that WEST

26 OVERLAND filled out, but to the IENET screens that INB (its legal agent) filled out, and which

27 automatically modified in 2015 based on TRAVELERS' changes to the system. Obviously any

28 errors in these screens are TRAVELERS' fault because they were errors made by its agent, INB,

1    and compounded by TRAVELERS' negligent system update.

2        35.    TRAVELERS refused to reform the POLICY upon request, even after being

3    shown the evidence that there was a mutual mistake and/or fraud. TRAVELERS even denies

4    that INB is its agent, even though they have several agency contracts together giving INB the

5    authority to solicit applications and bind insurance; even though INB was given authority to

6    underwrite policies including the POLICY itself using IENET; even though TRAVELERS

7    appointed INB as its agent with the California Department of Insurance; even though its

8    seasoned insurance professionals repeatedly refer to INB as its agent; and more. TRAVELERS

9    had all of this information right under its nose when handling the CLAIM, but refused to give it

10    weight. INB has admitted the obvious: that TRAVELERS acted in bad faith here and that INB is

11    TRAVELERS' legal agent for all actions alleged above.

12                        **THE SECOND FIRE CLAIM**

13        36.    Just before the 2016 fire, the POLICY automatically renewed and the PSE was

14    automatically part of the new POLICY.   The CLAIM for the 2016 fire was made under that

15    POLICY year.

16        37.    As luck would have it, before the next renewal, during the same POLICY year as

17    the 2016 fire, a second fire stared next door (again) and spread to WEST OVERLAND'S

18    PROPERTY (again) causing additional damage and compounding the LOSS.

19        38.    WEST OVERLAND submitted a request for payment for this additional damage,

20    expecting that it would be covered because it had asked the PSE to be removed. Absolutely

21    shockingly, TRAVELERS denied any coverage, citing one and only one reason: the PSE.

22        39.    Incredibly, WEST OVERLAND has learned that TRAVELERS responded to its

23    demands that the PSE be removed by *agreeing* the PSE should not be in the POLICY, but by

24    doing nothing to remove it now, and simply notifying the renewal agent that when the renewal

25    period comes long into the future (nearly a year from the date the notification was made), it

26    should be removed. It left it on during the remainder of that POLICY year for no reason at all

27    and in contravention of WEST OVERLAND's direct requests.

28        40.    As a result of the conduct of DEFENDANTS, WEST OVERLAND has been

1  deprived of insurance coverage for the first claim, and has suffered other consequential damages.

2  Additionally, as to the first claim, DEFENDANTS have engaged in conduct that was oppressive,

3  fraudulent and malicious within the meaning of Civil Code section 3294, and DEFENDANTS

4  are liable for exemplary damages in an amount to be shown at trial.

5      41.    As a result of the conduct of DEFENDANTS, WEST OVERLAND has been

6  deprived of insurance coverage for the second claim, and has suffered other consequential

7  damages.  Additionally, as to the second claim, DEFENDANTS have engaged in conduct that

8  was oppressive, fraudulent and malicious within the meaning of Civil Code section 3294, and

9  DEFENDANTS are liable for exemplary damages in an amount to be shown at trial.

10                    **FIRST CAUSE OF ACTION**

11  (Professional Negligence of Agent - Against Defendant INB and TRAVELERS [policy inception

12                      through first claim])

13      42.    The allegations of paragraphs 1 through 35 and 40 are re-alleged and

14  incorporated herein.

15      43.    INB acted as an insurance agent for TRAVELERS for all conduct

16  described herein, and as such, TRAVELERS is vicariously liable for it.

17      44.    In the alternative, INB acted as a dual-agent broker.

18      45.    As an insurance agent and/or dual agent-broker, INB has a duty to use

19  reasonable care, diligence, and judgment in procuring the insurance coverage requested

20  by its customers, including WEST OVERLAND.

21      46.    As an insurance agent and/or dual agent-broker, INB has a duty to aid its

22  clients in obtaining coverage for losses that fall within the scope of their insurance

23  policies.

24      47.    INB breached its duty of care to WEST OVERLAND when, knowing

25  WEST OVERLAND sought a policy that would cover property damage at the

26  PROPERTY, including caused by fire, INB procured WEST OVERLAND a policy with

27  an endorsement that lead to the denial of coverage for the first claim.

28      48.    But for INB's breaches, WEST OVERLAND would have had insurance

11

SECOND AMENDED COMPLAINT

1  coverage for the first and second loss.

2      49.    When INB procured the POLICY for WEST OVERLAND, it was

3  foreseeable that WEST OVERLAND would be denied coverage in the event of a fire loss.

4      50.    Because TRAVELERS denied coverage for the first claim as a result of INB's

5  breach of duty, WEST OVERLAND has been damaged in the full amount of the first claim.

6  TRAVELERS is vicariously liable for any and all negligence of INB to the extent INB is found

7  to be an agent of TRAVELERS.

8                          **SECOND CAUSE OF ACTION**

9  (Professional Negligence of Agent - Against Defendant INB and TRAVELERS [second claim])

10     51.    The allegations of paragraphs 1 through 27, 36 through 39, and 41 are re-alleged

11  and incorporated herein.

12     52.    As discussed above, INB acted as an insurance agent for TRAVELERS for all

13  conduct described herein, and as such, TRAVELERS is vicariously liable for it.  In the

14  alternative, INB acted as a dual-agent broker.

15     53.    As an insurance agent and/or dual agent-broker, INB has a duty to use reasonable

16  care, diligence, and judgment in procuring the insurance coverage requested by its customers,

17  including WEST OVERLAND.

18     54.    As an insurance agent and/or dual agent-broker, INB has a duty to aid its clients

19  in obtaining coverage for losses that fall within the scope of their insurance policies.

20     55.    According to TRAVELERS, INB breached its duty of care to WEST

21  OVERLAND when, after the first fire claim, it failed to properly and correctly request that

22  TRAVELERS remove the PSE immediately.

23     56.    But for said breach, WEST OVERLAND would have had insurance coverage for

24  the second loss.

25     57.    Because TRAVELERS denied coverage for the second loss as a result of INB's

26  breach of duty, WEST OVERLAND has been damaged in the full amount of the second loss.  To

27  the extent that INB was acting as an agent of TRAVELERS, TRAVELERS is vicariously liable

28  for any and all negligence of INB.

**THIRD CAUSE OF ACTION**

(Negligent Misrepresentation – Against INB and TRAVELERS)

58.    The allegations of paragraphs 1 through 35 and 40 are re-alleged and incorporated herein.

59.    As an insurance agent and/or dual agent-broker, INB owes its customers a duty to accurately represent the nature, scope, and extent of their coverage.

60.    INB breached its duty of care by repeatedly misrepresenting to WEST OVERLAND that the POLICY provided insurance coverage against fire when it knew it was not because of the presence of the PSE.

61.    WEST OVERLAND relied on INB's repeated representations by keeping the POLICY in force and continuing to pay premiums, instead of procuring another policy that provided active fire coverage or taking other steps to ensure coverage was in place.

62.    Because TRAVELERS denied coverage for the first claim as a result of INB's breach of duty, WEST OVERLAND has been damaged in the full amount of the first loss.

63.    To the extent that INB acted as TRAVELERS' agent for this conduct, TRAVELERS is vicariously liable for said conduct.

**FOURTH CAUSE OF ACTION**

(Fraud – Against INB and TRAVELERS [policy inception through the first insurance claim])

64.    The allegations of paragraphs 1 through 35 and 40 are re-alleged and incorporated herein.

65.    TRAVELERS added the PSE to the POLICY with the understanding that given TRAVELERS interpretation of it, it would preclude all coverage for WEST OVERLAND, as it knew that WEST OVERLAND did not have fire sprinklers in at least 80% the PROPERTY.

66.    INB misrepresented to WEST OVERLAND that the POLICY provided coverage against fire, as discussed above.

SECOND AMENDED COMPLAINT

67.    At this time INB knew that the PSE precludes coverage for fire under TRAVELERS' reading because the PROPERTY was not at least 80% sprinklered.

68.    INB knew that the POLICY it obtained was inconsistent with WEST OVERLAND's requests as a result of the PSE, but intentionally hid that fact from WEST OVERLAND.

69.    TRAVELERS sold the POLICY knowing it would not provide coverage in the event of a fire loss because of the PSE. TRAVELERS actively concealed that fact, including by failing to mention the PSE in the coverage proposal, and failing to send WEST OVERLAND the forms warning about its interpretation of the PSE. TRAVELERS instead continued to represent that coverage was in force.

70.    DEFENDANTS engaged in the above conduct to induce WEST OVERLAND to purchase the POLICY, keep the POLICY in full force and effect by continuing to pay premiums, and refrain from obtaining other coverage, as discussed above. INB and TRAVELERS profited from each premium payment WEST OVERLAND made.

71.    INB made these representations with the permission, knowledge, ratification and consent of its principal, TRAVELERS. To the extent INB acted as an agent of TRAVELERS, INB's conduct is binding on and attributable to TRAVELERS.

72.    WEST OVERLAND relied on DEFENDANTS' misrepresentations to keep the POLICY in force, pay premiums, and not obtain alternative coverage.

73.    As a result of DEFENDANTS' fraud, and assuming DEFENDANTS are correct in their interpretation of the PSE, WEST OVERLAND has been damaged in the full amount of the LOSS and premiums paid for worthless coverage. WEST OVERLAND also seeks punitive damages from DEFENDANTS for acting fraudulently, oppressively and maliciously, as set forth above. WEST OVERLAND also seeks an order estopping TRAVELERS from denying the CLAIM, and an order reforming the POLICY, from the date of issuance, to remove the PROTECTIVE SAFEGUARDS ENDORSEMENT, as discussed below.

**FIFTH CAUSE OF ACTION**

(Fraud – Against TRAVELERS [second insurance claim])

14

1    74.    The allegations of paragraphs 1 through 27, and 36 through 39, 41 are re-

2    alleged and incorporated herein.

3    75.    As discussed above, after the first fire, WEST OVERLAND and INB

4    demanded that the POLICY be reformed and the PSE be removed.  TRAVELERS agreed

5    that it should be removed going forward and communicated that to both INB and WEST

6    OVERLAND.

7    76.    But, despite making these representations, instead of removing the PSE

8    immediately, TRAVELERS only made a notation to remove the PSE at the next POLICY

9    renewal, leaving nearly a year in between where WEST OVERLAND would have

10   worthless coverage.

11   77.    TRAVELERS intentionally hid that information from WEST

12   OVERLAND, while representing that it agreed the PSE should not be in the POLICY

13   moving forward.

14   78.    WEST OVERLAND relied on TRAVELERS' misrepresentations to keep

15   the POLICY in force, pay premiums, and not obtain alternative coverage.

16   79.    As a result of TRAVELERS' fraud, and assuming TRAVELERS is

17   correct in its interpretation of the PSE, WEST OVERLAND has been damaged in the full

18   amount of the second LOSS and premiums paid for worthless fire coverage.  WEST

19   OVERLAND also seeks punitive damages from TRAVELERS for acting fraudulently,

20   oppressively and maliciously, as set forth above. WEST OVERLAND also seeks an order

21   estopping TRAVELERS from denying the second CLAIM, and an order reforming the

22   POLICY, from the date of issuance, to remove the PROTECTIVE SAFEGUARDS

23   ENDORSEMENT, as discussed below.

24   **SIXTH CAUSE OF ACTION**

25   (Reformation of Insurance Contract – Against Defendant TRAVELERS [first insurance claim])

26   80.    The allegations of paragraphs 1 through 35 and 40 are re-alleged and

27   incorporated herein.

28   81.    After WEST OVERLAND approached INB for insurance, INB, on

1   TRAVELERS' behalf and as TRAVELERS' agent, agreed and intended to procure a policy that

2   would protect WEST OVERLAND against the risk of loss or damage to the PROPERTY due to

3   fire whether or not it had fire sprinklers.  TRAVELERS also had direct knowledge of that

4   intention and actually held it as well when INB communicated to TRAVELERS that WEST

5   OVERLAND's property was only partially sprinklered and TRAVELERS told INB to

6   underwriter the risk using IENET.

7         82.    Due to the fraud and/or mistake of DEFENDANTS as discussed above, WEST

8   OVERLAND was issued a policy that DEFENDANTS knew or should have known was

9   worthless, and obtained premiums for the same.

10        83.    As a result of the fraud/mistake of DEFENDANTS, assuming TRAVELERS'

11   interpretation of the PSE is correct, WEST OVERLAND was issued an insurance contract

12   inconsistent with the mutual intentions of the parties.  To correct that fraud and/or mistake,

13   WEST OVERLAND seeks an order reforming the POLICY, from the date of issuance, to

14   remove the PROTECTIVE SAFEGUARDS ENDORSEMENT.

15                     **SEVENTH CAUSE OF ACTION**

16            (Reformation – against TRAVELERS [second insurance claim])

17         84.    The allegations of paragraphs 1 through 27, 36 through 39 and 41 are re-alleged

18   and incorporated herein.

19         85.    Due to the fraud of TRAVELERS' as to the second claim and the removal of the

20   PSE, as discussed above, WEST OVERLAND was provided an insurance policy that

21   TRAVELERS knew or should have known was worthless, and obtained premiums for the same.

22         86.    Alternatively, if there is no fraud, then TRAVELERS' failure to reform the

23   POLICY to remove the PSE moving forward was a mistake on its part.  Additionally, WEST

24   OVERLAND did not intend for the POLICY to continue to contain the PSE.

25         87.    As a result of the fraud/mistake of TRAVELERS, assuming TRAVELERS'

26   interpretation of the PSE is correct, WEST OVERLAND was issued an insurance contract

27   inconsistent with the mutual intentions of the parties.  To correct that fraud and/or mistake,

28   WEST OVERLAND seeks an order reforming the POLICY, from the date of issuance, to

1 | remove the PROTECTIVE SAFEGUARDS ENDORSEMENT.

2 | **EIGHTH CAUSE OF ACTION**

3 | (Violation of Business and Professions Code Section 17200 – Against INB and TRAVELERS

4 | [first insurance claim])

5 |     88.    The allegations of the paragraphs 1 through 35 and 40 re-alleged and

6 | incorporated herein.

7 |     89.    California Business and Professions Code section 17200 (the "Unfair

8 | Competition Law") prohibits acts of unfair competition, including any unlawful, unfair or

9 | fraudulent business practice or act.

10 |     90.    California Business & Professions Code section 17204 sets forth the

11 | standing requirements for an unfair competition action. It provides than an individual

12 | may pursue such an action if the person "suffered injury in fact and has lost money or

13 | property as a result of unfair competition." WEST OVERLAND has standing in this

14 | action because it has suffered an injury in fact and lost money or property in the form of a

15 | premiums paid resulting from DEFENDANTS' violation of the California Insurance

16 | Code, as follows:

17 |     a.  California Insurance Code section 332 provides, "Each party to a contract

18 |       of insurance shall communicate to the other, in good faith, all facts within

19 |       his knowledge which are or which he believes to be material to the

20 |       contract and as to which he makes no warranty, and which the other has

21 |       not the means of ascertaining." DEFENDANTS violated California

22 |       Insurance Code section 332 by, in bad faith, failing to communicate to

23 |       WEST OVERLAND all facts within their knowledge, as to the first claim,

24 |       that are material to the contract, as discussed above.

25 |     b.  California Insurance Code section 333 provides: "Neither party to a

26 |       contract of insurance is bound to communicate information of the matters

27 |       following, except in answer to the inquiries of the other [… t]hose which

28 |       the other knows[; t]hose which, in the exercise of ordinary care, the other

1    ought to know, and of which the party has no reason to suppose him

2    ignorant[; t]hose of which the other waives communication[; t]hose which

3    prove or tend to prove the existence of a risk excluded by a warranty, and

4    which are not otherwise material[ and t]hose which relate to a risk

5    excepted from insurance, and which are not otherwise material."

6    DEFENDANTS violated California Insurance Code section 333 by failing

7    to communicate and/or misrepresenting information, regarding the first

8    claim, that they are obligated to share by this section after WEST

9    OVERLAND so requested said information, as discussed above.

10   c.  California Insurance Code section 80 provides: "An insurer or officer or

11       agent thereof, or an insurance broker or solicitor shall not cause or permit

12       to be issued, circulated or used, any statement that is known, or should

13       have been known, to be a misrepresentation of [t]he terms of a policy

14       issued by the insurer or sought to be negotiated by the person making or

15       permitting the misrepresentation[; t]he benefits or privileges promised

16       thereunder[; or t]he future dividends payable thereunder." DEFENDANTS

17       violated California Insurance Code section 80 by issuing, circulating and

18       using statements, regarding the first claim, known to be misrepresentations

19       of the terms of the POLICY and whether the CLAIM was covered, as

20       discussed above.

21   d.  California Insurance Code section 781(a)(1) provides, "A person shall not

22       make any statement that is known, or should have been known, to be a

23       misrepresentation [] to any other person for the purpose of inducing, or

24       tending to induce, such other person either to take out a policy of

25       insurance, or to refuse to accept a policy issued upon an application

26       therefor and instead take out any policy in another insurer[.]"

27       DEFENDANTS violated California Insurance Code section 781(a)(1) by

28       making statements they knew and/or should have known were

1                                       misrepresentations to WEST OVERLAND, as to the first claim, for the

2                                       purpose of inducing WEST OVERLAND to take out and continue to

3                                       renew the POLICY, as discussed above.

4                         e.   California Insurance Code section 2071 is stated above.  TRAVELERS

5                                       violation Section 2071 by failing to provide WEST OVERLAND with all

6                                       CLAIM-related documents, as defined in that section, within 15 days of

7                                       the request.  TRAVELERS did so to continue to hide its fraudulent

8                                       scheme, in regard to the first claim.

9        91.     DEFENDANTS engaged in the above-mentioned conduct as part of an

10  unlawful, unfair, and fraudulent business practice.  As a proximate result of

11  DEFENDANTS' violation of the Unfair Competition Law, WEST OVERLAND has

12  suffered economic injury-in-fact in the form of payment of premiums for worthless fire

13  coverage through the first insurance claim.

14        92.     WEST OVERLAND seeks a Court order awarding it restitution for the

15  premiums paid for worthless coverage and/or disgorgement of profits resulting from the

16  same.  WEST OVERLAND further seeks an order enjoining TRAVELERS from

17  enforcing the PROTECTIVE SAFEGUARDS ENDORSEMENT.

18                                   **NINTH CAUSE OF ACTION**

19      (Violation of Business and Professions Code Section 17200 – Against TRAVELERS [second

20                                   insurance claim])

21        93.     The allegations of paragraphs 1 through 27, 36 through 39 and 41 are re-

22  alleged and incorporated herein.

23        94.     California Business and Professions Code section 17200 (the "Unfair

24  Competition Law") prohibits acts of unfair competition, including any unlawful, unfair or

25  fraudulent business practice or act.

26        95.     California Business & Professions Code section 17204 sets forth the

27  standing requirements for an unfair competition action.  It provides than an individual

28  may pursue such an action if the person "suffered injury in fact and has lost money or

1    property as a result of unfair competition." WEST OVERLAND has standing in this action

2    because it has suffered an injury in fact and lost money or property in the form of a premiums

3    paid resulting from DEFENDANTS' violation of the California Insurance Code, as follows:

4         a. California Insurance Code section 332 provides, "Each party to a contract

5           of insurance shall communicate to the other, in good faith, all facts within

6           his knowledge which are or which he believes to be material to the

7           contract and as to which he makes no warranty, and which the other has

8           not the means of ascertaining." TRAVELERS violated California

9           Insurance Code section 332 by, in bad faith, failing to communicate to

10          WEST OVERLAND all facts within their knowledge that are material to

11          the contract, as discussed above, as to the second claim.

12        b. California Insurance Code section 333 provides: "Neither party to a

13          contract of insurance is bound to communicate information of the matters

14          following, except in answer to the inquiries of the other [… t]hose which

15          the other knows[; t]hose which, in the exercise of ordinary care, the other

16          ought to know, and of which the party has no reason to suppose him

17          ignorant[; t]hose of which the other waives communication[; t]hose which

18          prove or tend to prove the existence of a risk excluded by a warranty, and

19          which are not otherwise material[ and t]hose which relate to a risk

20          excepted from insurance, and which are not otherwise material."

21          TRAVELERS violated California Insurance Code section 333 by failing

22          to communicate and/or misrepresenting information they are obligated to

23          share by this section after WEST OVERLAND so requested said

24          information, as discussed above, as to the second claim.

25        c. California Insurance Code section 80 provides: "An insurer or officer or

26          agent thereof, or an insurance broker or solicitor shall not cause or permit

27          to be issued, circulated or used, any statement that is known, or should

28          have been known, to be a misrepresentation of [t]he terms of a policy

1  issued by the insurer or sought to be negotiated by the person making or

2  permitting the misrepresentation[; t]he benefits or privileges promised

3  thereunder[; or t]he future dividends payable thereunder." TRAVELERS

4  violated California Insurance Code section 80 by issuing, circulating and

5  using statements known to be misrepresentations of the terms of the

6  POLICY and whether the CLAIM was covered, as discussed above, as to

7  the second claim.

8    d.  California Insurance Code section 781(a)(1) provides, "A person shall not

9  make any statement that is known, or should have been known, to be a

10  misrepresentation [] to any other person for the purpose of inducing, or

11  tending to induce, such other person either to take out a policy of

12  insurance, or to refuse to accept a policy issued upon an application

13  therefor and instead take out any policy in another insurer[.]"

14  TRAVELERS violated California Insurance Code section 781(a)(1) by

15  making statements they knew and/or should have known were

16  misrepresentations to WEST OVERLAND for the purpose of inducing

17  WEST OVERLAND to take out and continue to renew the POLICY, as

18  discussed above, as to the second claim.

19    e.  California Insurance Code section 2071 is stated above.  TRAVELERS

20  violation Section 2071 by failing to provide WEST OVERLAND with all

21  CLAIM-related documents, as defined in that section, within 15 days of

22  the request.  TRAVELERS did so to continue to hide its fraudulent

23  scheme.

24    96.    TRAVELERS engaged in the above-mentioned conduct as part of an

25  unlawful, unfair, and fraudulent business practice.  As a proximate result of

26  TRAVELERS' violation of the Unfair Competition Law, WEST OVERLAND has

27  suffered economic injury-in-fact in the form of payment of premiums for worthless fire

28  coverage from the first claim to the final expiration of the POLICY.

97.    WEST OVERLAND seeks a Court order awarding it restitution for the premiums paid for worthless coverage and/or disgorgement of profits resulting from the same. WEST OVERLAND further seeks an order enjoining TRAVELERS from enforcing the PROTECTIVE SAFEGUARDS ENDORSEMENT.

**TENTH CAUSE OF ACTION**

(Breach of Contract - Against Defendant TRAVELERS [first insurance claim])

98.    The allegations of paragraphs 1 through 35 and 40 are re-alleged and incorporated herein.

99.    At all material times herein, a valid contract (the POLICY) existed between WEST OVERLAND and TRAVELERS obligating TRAVELERS to pay insurance benefits to WEST OVERLAND in the event of a covered fire loss.

100.    At all material times herein, WEST OVERLAND performed all duties required of it under the contract, including giving WEST OVERLAND prompt notice of both the first claim, and cooperating in TRAVELERS' evaluation of the claim.

101.    The first fire loss was covered under the applicable POLICY. The purported condition precedent to coverage in the PSE is unenforceable as a matter of law and does not even apply here, as discussed above. If it does apply to the POLICY, it was waived. Further, it does not bar coverage, also as discussed above. The PSE is also ambiguous. As a result, insurance benefits are and remain payable to WEST OVERLAND.

102.    TRAVELERS breached the contract by refusing to indemnify WEST OVERLAND for the first claim.

103.    As a result of TRAVELERS' breach, WEST OVERLAND has been damaged in the full amount of the first claim.

**ELEVENTH CAUSE OF ACTION**

(Breach of Contract - Against Defendant TRAVELERS [second insurance claim])

104.    The allegations of paragraphs 1 through 27, 36 through 39 and 41 are re-alleged and incorporated herein.

105.    At all material times herein, a valid contract (the POLICY) existed between

22

SECOND AMENDED COMPLAINT

1  WEST OVERLAND and TRAVELERS obligating TRAVELERS to pay insurance

2  benefits to WEST OVERLAND in the event of a covered fire loss.

3       106.    At all material times herein, WEST OVERLAND performed all duties

4  required of it under the contract, including giving WEST OVERLAND prompt notice of

5  the second claim, and cooperating in TRAVELERS' evaluation of the second claim.

6       107.    The second fire loss was covered under the applicable POLICY. The

7  purported condition precedent to coverage in the PSE is unenforceable as a matter of law

8  and does not even apply here, as discussed above. If it does apply to the POLICY, it was

9  waived. Further, it does not bar coverage, also as discussed above. The PSE is also

10  ambiguous. As a result, insurance benefits are and remain payable to WEST

11  OVERLAND.

12       108.    TRAVELERS breached the contract by refusing to indemnify WEST

13  OVERLAND for the second claim.

14       109.    As a result of TRAVELERS' breach, WEST OVERLAND has been

15  damaged in the full amount of the second claim.

16                       **TWELFTH CAUSE OF ACTION**

17  (Breach of the Covenant of Good Faith and Fair Dealing - Against Defendant TRAVELERS

18                            [first insurance claim])

19       110.    The allegations of paragraphs 1 through 35 and 40 are re-alleged and

20  incorporated herein.

21       111.    A valid insurance contract existed between WEST OVERLAND and

22  TRAVELERS.

23       112.    Arising out of the contract, TRAVELERS owed WEST OVERLAND a

24  duty of good faith and fair dealing.

25       113.    TRAVELERS breached that duty as regards the first claim by, *inter alia*,

26            a.  Consciously and unreasonably withholding POLICY benefits due to

27                WEST OVERLAND on account of the LOSS;

28            b.  Consciously and unreasonably setting out to create a plausible sounding

                                   23

1  but false basis upon which to deny the CLAIM;

2  c. Consciously and unreasonably failing to thoroughly and fairly investigate

3  all information reasonably available to it;

4  d. Consciously and unreasonably delaying, refusing and continuing to refuse

5  to pay WEST OVERLAND benefits it knows are owed under the

6  POLICY;

7  e. Consciously and unreasonable refusing to fully investigate the CLAIM in

8  good faith and refusing to give WEST OVERLAND's interests at least as

9  much as its own;

10  f. Consciously and unreasonably failing to adopt and implement reasonable

11  or proper standards for the prompt and fair investigation of the CLAIM;

12  g. Consciously and unreasonably failing to attempt in good faith to effectuate

13  a prompt, fair and equitable settlement of the CLAIM even though liability

14  for it was and is reasonably clear;

15  h. Consciously and unreasonably refusing to provide WEST OVERLAND

16  with all evidence purportedly supporting its bases to deny the CLAIM,

17  including the application for insurance; and

18  i. Consciously and unreasonably refusing to reform the POLICY on multiple

19  occasions, knowing the POLICY must be reformed and would be

20  reformed by a court of law.

21  114.  Said conduct included unfair and deceptive acts or practices and unfair methods

22  of competition as part of a pattern and practice of improper claims administration.

23  115.  TRAVELERS' legal agent, INB, had admitted that TRAVELERS denied the first

24  claim in bad faith.

25  116.  As a proximate cause of TRAVELERS' actions, WEST OVERLAND has been

26  damaged as set forth above. Further, WEST OVERLAND seeks punitive damages from

27  TRAVELERS for acting fraudulently, oppressively and maliciously, as set forth above, including

28  based on its pattern and practice of bad faith towards WEST OVERLAND as exemplified by the

1    allegations incorporated herein as well as paragraphs 36 through 39

2    <u>THIRTEEN CAUSE OF ACTION</u>

3    (Breach of the Covenant of Good Faith and Fair Dealing - Against Defendant TRAVELERS

4    [second insurance claim])

5    117.    The allegations of paragraphs 1 through 27, 36-39 and 41 are re-alleged

6    and incorporated herein.

7    118.    A valid insurance contract existed between WEST OVERLAND and

8    TRAVELERS.

9    119.    Arising out of the contract, TRAVELERS owed WEST OVERLAND a

10    duty of good faith and fair dealing.

11    120.    TRAVELERS breached that duty as to the second claim by, inter alia,

12        a.    Consciously and unreasonably withholding POLICY benefits due to

13            WEST OVERLAND on account of the LOSS;

14        b.    Consciously and unreasonably setting out to create a plausible sounding

15            but false basis upon which to deny the CLAIM;

16        c.    Consciously and unreasonably failing to thoroughly and fairly investigate

17            all information reasonably available to it;

18        d.    Consciously and unreasonably delaying, refusing and continuing to refuse

19            to pay WEST OVERLAND benefits it knows are owed under the

20            POLICY;

21        e.    Consciously and unreasonable refusing to fully investigate the CLAIM in

22            good faith and refusing to give WEST OVERLAND's interests at least as

23            much as its own;

24        f.    Consciously and unreasonably failing to adopt and implement reasonable

25            or proper standards for the prompt and fair investigation of the CLAIM;

26        g.    Consciously and unreasonably failing to attempt in good faith to effectuate

27            a prompt, fair and equitable settlement of the CLAIM even though liability

28            for it was and is reasonably clear;

SECOND AMENDED COMPLAINT

1          h. Consciously and unreasonably refusing to provide WEST OVERLAND

2              with all evidence purportedly supporting its bases to deny the CLAIM,

3              including the application for insurance; and

4          i. Consciously and unreasonably refusing to reform the POLICY on multiple

5              occasions, knowing the POLICY must be reformed and would be

6              reformed by a court of law.

7       121.    Said conduct included unfair and deceptive acts or practices and unfair methods

8 of competition as part of a pattern and practice of improper claims administration.

9       122.    TRAVELERS' legal agent, INB, had admitted that TRAVELERS denied the

10 second claim in bad faith.

11       123.    As a proximate cause of TRAVELERS' actions, WEST OVERLAND has been

12 damaged as set forth above. Further, WEST OVERLAND seeks punitive damages from

13 TRAVELERS for acting fraudulently, oppressively and maliciously, as set forth above, including

14 based on its pattern and practice of bad faith towards WEST OVERLAND as exemplified by the

15 allegations incorporated herein as well as those related to its conduct on the first claim.

16                     **FOURTEENTH CAUSE OF ACTION**

17                 (Tort of Another - Against Defendant INB)

18       124.    The allegations of the preceding paragraphs are re-alleged and incorporated

19 herein.

20       125.    As discussed above, INB was negligent in regard to underwriting the POLICY.

21 Specifically, INB entered incorrect information into the TRAVELERS' IENET system regarding

22 the existing of fire sprinklers in all units of the PROPERTY.

23       126.    Additionally, as also discussed above, TRAVELERS contends that it was INB's

24 duty to ensure the PSE was properly and immediately removed from the POLICY after the first

25 fire, but that it negligently failed to do so. WEST OVERLAND thus contends in the alternative

26 and in reliance upon TRAVELERS' assertion that INB was negligent in this respect as well.

27       127.    As a result of INB's negligence, the POLICY was issued with the PSE, which

28 TRAVELERS has relied on to deny coverage. Also as a result of INB's negligence, the PSE was

not removed from the POLICY after the first fire and before the second. But for INB's error, the PSE would not have been in the POLICY at the time of the first and second claims, benefits would have been paid for the losses, and this litigation never would have been necessary.

128. But, as a result of INB's negligence, WEST OVERLAND has been forced to litigate against TRAVELERS for insurance benefits on both claims under the POLICY that were wrongfully denied. WEST OVERLAND has been required to incur substantial attorney fees in this regard.

129. Accordingly, INB is liable for WEST OVERLAND's attorney's fees incurred in this matter under the tort of another doctrine, as its negligence has caused WEST OVERLAND to institute this litigation and incur attorney fees to obtain the benefits of the POLICY.

### PRAYER FOR RELIEF

WHEREFORE, WEST OVERLAND prays for relief as follows:

1. For general and special damages according to proof (against TRAVELERS and INB);

2. For consequential damages according to proof (against TRAVELERS and INB);

3. For restitution of all premiums paid for the POLICY (against TRAVELERS);

4. For disgorgement of profits earned on premiums paid for the POLICY (against TRAVELERS);

5. For attorneys' fees and costs according to proof (against TRAVELERS and INB);

6. For exemplary and punitive damages (against TRAVELERS);

7. For reformation of the POLICY (against TRAVELERS);

8. For an order that TRAVELERS is estopped from denying either claim;

9. For an order that TRAVELERS is enjoined from denying either claim; and

10. Such other relief as the Court deems just and proper (against TRAVELERS and INB).

SECOND AMENDED COMPLAINT

1 Dated: November 6, 2017    **KERR & WAGSTAFFE LLP**

2

3         By: _____
          IVO LABAR

4         Attorneys for Plaintiff
         WEST OVERLAND LLC

5

6

7

8

9

10

11       **JURY TRIAL DEMAND**

12  WEST OVERLAND hereby demands a trial by jury as to all claims triable by jury.

13

14 Dated: November 6, 2017    **KERR & WAGSTAFFE LLP**

15

16         By: _____
          IVO LABAR

17

18         Attorneys for Plaintiff
         WEST OVERLAND LLC

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I, Ginie Phan, declare that I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Kerr & Wagstaffe LLP, 101 Mission Street, 18th Floor, San Francisco, California 94105-1727.

On November 6, 2017, I served the following document(s):

**SECOND AMENDED COMPLAINT FOR: (1) PROFESSIONAL NEGLIGENCE; (2) PROFESSIONAL NEGLIGENCE; (3) NEGLIGENT MISREPRESENTATION; (4) FRAUD; (5) FRAUD; (6) REFORMATION; (7) REFORMATION; (8) VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200; (9) VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200; (10) BREACH OF CONTRACT; (11) BREACH OF CONTRACT; (12) BAD FAITH; (13) BAD FAITH; (14) TORT OF ANOTHER**

on the parties listed below as follows:

| | |
|---|---|
| Mark D. Peterson<br>**CATES PETERSON LLP**<br>4100 Newport Place, Suite 230<br>Newport Beach, CA 92660<br>Telephone: (949) 724-1180<br>Fax: (949) 724-1190<br><br>Email:<br>MarkPeterson@catespeterson.com<br><br>*Attorneys for Travelers Casualty Insurance Company of America* | Ronald D. Echeguren<br>G. Dennis Rodgers<br>Joshua J. Bettencourt<br>**CRESSWELL, ECHEGUREN, RODGERS & HARVEY**<br>180 Grand Avenue, Suite 440<br>Oakland, CA 94612<br>Telephone: (510) 444-1735<br>Fax: (510) 444-6923<br><br>Email: recheguren@cresswell-law.com<br>Email: drodgers@cresswell-law.com<br>Email: jbettencourt@cresswell-law.com<br><br>*Attorneys for INB Insurance Services Corp.* |

☒ **By first class mail** by placing a true copy thereof in a sealed envelope with postage thereon fully prepaid and placing the envelope in the firm's daily mail processing center for mailing in the United States mail at San Francisco, California.

☐ **By electronic service** I have caused such document(s) to be emailed or electronically transmitted to the person(s) at the email addresses set forth above.

☐ **By facsimile machine** (FAX) by personally transmitting a true copy thereof via an electronic facsimile machine.

☐ **By personal service** by causing to be personally delivered a true copy thereof to the address(es) listed herein at the location listed herein.

☐ **By Federal Express** or overnight courier.

PROOF OF SERVICE

1        I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct.

    Executed on November 6, 2017, at San Francisco, California.

3

4    _____

5    GINIE PHAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "B"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

WEST OVERLAND, LLC, a
California limited liability
company,

      Plaintiff,           Case No.  RG16837763

vs.

TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA, a
Connecticut corporation; and
INB INSURANCE SERVICES CORP.,
a California corporation,,

      Defendants.
_____/

Pages 1 through 225, inclusive.

VIDEOTAPED DEPOSITION OF CHARLES ANDRIST

Thursday, October 5, 2017

10:16 a.m.

Cresswell, Echeguren, Rodgers & Harvey

180 Grand Avenue, Suite 440

Oakland, California

REPORTED BY:

DEBBY CLARY, CSR No. 9705

REGISTERED MERIT REPORTER

## Page 2

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3       KERR & WAGSTAFFE, LLP

 4       BY:  DANIEL J. VEROFF, ATTORNEY AT LAW

 5       101 Mission Street, 18th Floor

 6       San Francisco, California 94105-1727

 7       (415) 371-8500

 8       veroff@kerrwagstaffe.com

 9   FOR THE DEPONENT:

10       CRESSWELL, ECHEGUREN, RODGERS & HARVEY

11       BY:  JOSHUA J. BETTENCOURT, ATTORNEY AT LAW

12       180 Grand Avenue, Suite 440

13       Oakland, California 94612

14       (510) 444-1735

15       jbettencourt@cresswell-law.com

16   FOR THE DEFENDANT TRAVELERS CASUALTY INSURANCE COMPANY

17   OF AMERICA:

18       CATES PETERSON, LLP

19       BY:  MARK D. PETERSON, ATTORNEY AT LAW

20       4100 Newport Place, Suite 230

21       Newport Beach, California 92660

22       (949) 724-1180

23       mpeterson@catespeterson.com

24

25   Also present:  Jason Patrick Sayler, videographer
```

## Page 3

```
 1              INDEX TO EXAMINATION

 2       WITNESS:  CHARLES ANDRIST

 3

 4

 5   EXAMINATION                          PAGE

 6       MR. VEROFF                     7, 201

 7       MR. PETERSON                 112, 216
```

## Page 4

```
 1              INDEX TO EXHIBITS

 2       WEST OVERLAND, LLC vs. TRAVELERS, et al.

 3       Thursday, October 5, 2017

 4

 5

 6   MARKED      DESCRIPTION                  PAGE

 7   Exhibit 192   Photocopy of handwritten note   49

 8                 to Janice from Chuck, 6-23-09,

 9                 INB 00324

10   Exhibit 193   File memo INB 00322           68

11   Exhibit 194   INB 00135                     70

12   Exhibit 195   INB 01805 to -1806            78

13   Exhibit 196   TR005574 to -5576             94

14   Exhibit 197   INB 00397                    108

15   Exhibit 198   TR006077 to -6088            129

16

17       MARKED PREVIOUSLY BUT ATTACHED FOR REFERENCE

18   Exhibit 2     FAX                          127

     Exhibit 3     INB 990 and 991              125

19   Exhibit 4     Application, property section, 128

                   INB 668, 669, 670

20   Exhibit 8     June 8 letter from Allied,   139

                   INB 434

21   Exhibit 10    Emails, INB 421 through 422  141

     Exhibit 11    Post-its INB 449 through 452 143

22   Exhibit 12    INB 418                      144

     Exhibit 13    INB 404 through 412          146

23   Exhibit 14    INB 390 through 392          150

     Exhibit 24    FAX cover sheet  INB 369     153

24   Exhibit 25    Memo dated June 23rd, 2009    56

     Exhibit 26    Memo dated June 23rd, 2009    50

25   Exhibit 27    Travelers screenshots        166
```

## Page 5

```
 1   MARKED PREVIOUSLY BUT ATTACHED FOR REFERENCE

 2   Exhibit 28    Email to Jennifer Chen        61

                   dated June 24, 2009

 3   Exhibit 29    June 24, 2009, FAX           175

     Exhibit 31    Typewritten application dated 189

 4                 June 25th of 2009

     Exhibit 32    Document from Ms. Chen,      177

 5                 June 24/25, 2009

     Exhibit 33    Post-it notes                 58

 6   Exhibit 36    Insurance policy             179

     Exhibit 39    Protective safeguard endorsement 85

 7   Exhibit 55    Travelers proposal of insurance 61

     Exhibit 77    California Department of      97

 8                 Insurance's certificate

     Exhibit 93    Agency contract with Travelers, 101

 9                 effective September 1, 2005

     Exhibit 94    New business override agreement 102

10

11

12                 ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Charles Andrist
October 05, 2017

Page 26

1    A.  I remember the street; I don't remember the
2  numbers.
3    Q.  Okay.  But in any event, we're talking about
4  the property that's the subject of this lawsuit,
5  correct?
6    A.  Correct.
7    Q.  And you understand this lawsuit is about
8  Travelers denying a claim for fire insurance coverage
9  for West Overland's property, correct?
10    A.  I do.
11    Q.  Do you recall when, when -- excuse me -- when
12  INB was first given access to the quote-to-issue system
13  Travelers Express?
14    MR. BETTENCOURT:  Objection; calls for
15  speculation.
16    THE WITNESS:  I do not.
17  BY MR. VEROFF:
18    Q.  But you do recall that INB had access to the
19  system in 2009, correct?
20    A.  Correct.
21    Q.  And you mentioned that the West Overland's
22  policy was written through the Travelers Express system;
23  is that correct?
24    MR. BETTENCOURT:  Objection; misstates prior
25  testimony.

Page 27

1    MR. PETERSON:  Vague as to the term "written."
2    THE WITNESS:  I believe it was written through
3  a computer program and it may have been called that.
4  BY MR. VEROFF:
5    Q.  Did you personally ever receive any training on
6  how to use that program?
7    A.  I did not.
8    Q.  Do you have any recollection of who at INB
9  actually entered information into the Travelers Express
10  system for the West Overland policy?
11    MR. PETERSON:  Incomplete hypothetical, vague
12  as to time.
13    MR. BETTENCOURT:  Assumes facts.
14    THE WITNESS:  I believe it was the customer
15  service rep.
16  BY MR. VEROFF:
17    Q.  Do you remember which customer service rep in
18  particular?
19    MR. BETTENCOURT:  Same objection.
20    MR. PETERSON:  Same objection.
21    THE WITNESS:  Well, I remember Janice Schultz
22  was entering the policy in question.
23  BY MR. VEROFF:
24    Q.  And is it your understanding that Ms. Schultz
25  is deceased now?

Page 28

1    A.  Yes.
2    Q.  Did you oversee Ms. Schultz's efforts to enter
3  the information in Travelers Express for the West
4  Overland policy?
5    A.  I did not.
6    Q.  Did you provide her the information that she
7  used to enter the information into the system?
8    MR. BETTENCOURT:  Objection; vague and
9  ambiguous.
10    MR. PETERSON:  Same.
11    MR. BETTENCOURT:  Assumes facts.
12    MR. PETERSON:  Join.
13    THE WITNESS:  I gave her my quote file that had
14  all the information in it.
15  BY MR. VEROFF:
16    Q.  All right.  So let's step back a little bit and
17  talk about how you first became involved with West
18  Overland's policy.
19    So did West Overland come to you, come to INB
20  in 2009 and ask for your help to purchase an insurance
21  policy for the property?
22    A.  No.
23    Q.  How did INB come about being involved in that
24  process?
25    A.  It was Jennifer Chen that contacted me, I

Page 29

1  believe it was May 29, 2009, saying that she was -- in a
2  FAX -- purchasing or wanting to purchase a location in
3  Oakland, would I please call.
4    Q.  What did you do after receiving that FAX?
5    MR. BETTENCOURT:  Objection; overbroad, vague
6  and ambiguous.
7    MR. PETERSON:  Join.
8  BY MR. VEROFF:
9    Q.  What was the first thing you did after
10  receiving the FAX?
11    MR. BETTENCOURT:  Same objection.
12    THE WITNESS:  I started to put together a quote
13  file on the various characteristics of the property that
14  was located in Oakland.  I did that by contacting the
15  client, Jennifer Chen.  One of the things I remember I
16  asked is what's the name of the, what would be the name
17  on the policy, and I was told it was West Oakland --
18  Overland.
19  BY MR. VEROFF:
20    Q.  All right.  And did you ask Ms. Chen to provide
21  information about the property's characteristics?
22    A.  I did.
23    Q.  And was Ms. Chen helpful?
24    A.  Yes.  She answered questions, and sometimes I
25  didn't get a full answer so I'd go back again and re-ask

Page 30

1  the question until I finally got what I thought was
2  enough information to put on an application.
3      It also included my going on the Internet and
4  obtaining some information on the location that was now
5  under the control of the bank.
6      Q.  Right.  So it's your understanding Ms. Chen was
7  trying to purchase the property from the bank that owned
8  it at the time?
9      A.  Correct.
10         MR. PETERSON:  Lack of foundation.
11  BY MR. VEROFF:
12      Q.  Did you ever ask Ms. Chen, or do you recall
13  asking Ms. Chen if the property had any fire suppression
14  sprinklers?
15      A.  I did request that information along with
16  everything else.
17      Q.  Do you recall what Ms. Chen's response was
18  about the sprinklers?
19      A.  Ms. Chen referred me to, I think it was the
20  developer that had information about the construction,
21  and he had told -- told me at that time that it was
22  partially sprinkled.
23      Q.  Did he use those terms, partially sprinklered,
24  or did he say something else, to the extent you
25  remember?

Page 31

1      A.  I'm going to say that he said partially
2  sprinkled as best as I can remember.
3      Q.  And when you talked to -- I'll call him the
4  developer for now.  When you talked to the developer, by
5  that time, had you already prepared and submitted any
6  written applications for insurance to Travelers?
7      A.  Yes.  I got the first FAX from Jennifer Chen on
8  the 29th of May, 2009, and seven days later,
9  approximately, I had an application dated June 4th.  And
10  I sent that out to -- gesundheit -- four different
11  markets.
12      Q.  And did that application provide any
13  information about whether the property had fire
14  suppression sprinklers?
15         MR. BETTENCOURT:  Objection; vague and
16  ambiguous.
17         THE WITNESS:  I recall that on that application
18  I wrote "sprinklered" on a particular box on the
19  policy -- on the application.
20  BY MR. VEROFF:
21      Q.  Do you know -- excuse me.
22      Do you recall where you got the information
23  from at that time that the property was sprinklered?
24      A.  I wouldn't have put down sprinklered if I
25  didn't believe that it was sprinkled.  But I do not

Page 32

1  recall what I saw during that seven-day period of
2  looking at material that led me to believe that.
3  Otherwise, I would have left it blank.
4      Q.  You mentioned you submitted this application to
5  four different markets.  Can you explain what you mean
6  when you say "markets"?
7      A.  That would be carriers that would possibly
8  consider writing the risk.
9      Q.  And one of those carriers was Travelers,
10  correct?
11      A.  Yes.
12      Q.  And as we discussed earlier, at that time you
13  had an agency contract with Travelers?
14         MR. PETERSON:  Vague as to the term "agency
15  contract."
16  BY MR. VEROFF:
17      Q.  INB had an agency contract?
18         MR. PETERSON:  Same objection.
19         MR. BETTENCOURT:  Objection; calls for a legal
20  conclusion.
21         THE WITNESS:  Yes.
22  BY MR. VEROFF:
23      Q.  And did you also submit that application to
24  Allied Insurance company?
25      A.  Yes.

Page 33

1      Q.  Do you recall if INB had an agency contract
2  with Allied --
3         MR. PETERSON:  Same objection.
4  BY MR. VEROFF:
5      Q.  -- at that time?
6      A.  Yes --
7         MR. BETTENCOURT:  Calls for legal conclusion.
8  Sorry.
9  BY MR. VEROFF:
10      Q.  Go ahead.
11      A.  Yes, I believe that that's true.
12      Q.  Do you have any recollection of how INB
13  received compensation from Allied based on business that
14  it either presented or wrote for Allied?
15         MR. BETTENCOURT:  Objection; calls for
16  confidential, privileged information.
17      You can answer if you know.
18         THE WITNESS:  We received commissions from
19  Allied.  I don't recall about the bonuses.
20  BY MR. VEROFF:
21      Q.  All right.  Now, in your compensation agreement
22  with Travelers, or excuse me, let me rephrase that.
23      Just in general at this point, when, when
24  you -- when INB was writing business for Travelers, did
25  it ever require any sort of payment from the applicant?

Charles Andrist
October 05, 2017

Page 46

1   Overland's property only had two units sprinklered?
2        MR. PETERSON:  Assumes facts.  Objection.
3        MR. BETTENCOURT:  Same objections.
4        THE WITNESS:  Yes.
5   BY MR. VEROFF:
6        Q.  And how did you come to that understanding?
7        A.  It was when I spoke with the, I believe it was
8   the developer, that told me that it was not -- that it
9   was partially sprinklered.
10       Q.  This was after you had submitted the
11  application to Travelers that you just used the word
12  "sprinklered," correct?
13       MR. BETTENCOURT:  Objection; vague and
14  ambiguous, compound, assumes facts.
15       THE WITNESS:  As best as I can recall.
16  BY MR. VEROFF:
17       Q.  And after then learning that, or coming to
18  understand that two units were sprinklered, did you make
19  any efforts to update Travelers that there was only two
20  units sprinklered as opposed to being fully sprinklered?
21       MR. PETERSON:  Objection; overbroad.  Vague as
22  to time.
23       MR. BETTENCOURT:  Compound and vague.
24       THE WITNESS:  I did.
25  /

Page 47

1   BY MR. VEROFF:
2        Q.  And did you do that during your telephone call
3   with Kevin Kiernan?
4        MR. PETERSON:  Objection; lack of foundation.
5        MR. BETTENCOURT:  Objection; assumes facts.
6   BY MR. VEROFF:
7        Q.  Let me ask you:  Did you actually have a
8   telephone call with Kevin Kiernan?
9        A.  Yes.
10       Q.  Okay.
11       A.  Best I recall it's, as best as I can recall.
12       MR. BETTENCOURT:  I'm objecting that it assumes
13  facts because I don't know if we have any indication of
14  what Kevin's last name was.
15       MR. PETERSON:  Yeah, I join that.  I join that
16  objection.
17       MR. VEROFF:  Okay.  Fair enough.
18       Q.  Do you recall Kevin's last name being Kiernan?
19       A.  No.
20       Q.  Do you understand today that his last name may
21  have been Kiernan?
22       MR. BETTENCOURT:  Objection; calls for
23  speculation.
24       MR. VEROFF:  Calls for speculation.
25       THE WITNESS:  Sure.

Page 48

1   BY MR. VEROFF:
2        Q.  Okay.  So in your telephone call with Kevin,
3   underwriter with Travelers, do you recall what you told
4   him as to the situation with fire sprinklers at West
5   Overland's property?
6        MR. PETERSON:  Objection; lack of foundation
7   and vague as to time.
8        THE WITNESS:  As I stated earlier, I don't
9   actually recall the conversation, but I will say that I
10  was the one that was reaching out to the underwriter so
11  I could go over the risk characteristics.  I had a
12  Post-it note on the top of the file stating to make sure
13  that the carriers understood that it was three stories
14  with the garage on the first floor and that the risk was
15  partially sprinkled.
16       And I certainly believe that I would have said
17  those facts to the underwriter at that time.
18       MR. PETERSON:  Move to strike as not supported
19  by the witness's percipient knowledge, that the
20  testimony's speculation.
21  BY MR. VEROFF:
22       Q.  Would it have been your normal practice and
23  procedure at INB that if you had submitted an
24  application to a carrier and then you subsequently
25  learned that some information on the application was

Page 49

1   inaccurate, that you would contact the carrier and clear
2   that up?
3        MR. PETERSON:  Objection; leading, overbroad,
4   assumes facts not in evidence, calls for speculation,
5   and vague as to time.
6        MR. BETTENCOURT:  Vague and ambiguous,
7   incomplete hypothetical.
8        THE WITNESS:  I would have.
9   BY MR. VEROFF:
10       Q.  And so you don't recall what -- well, let me
11  rephrase it.
12       MR. BETTENCOURT:  Let's take -- we need to take
13  a quick break.  My computer's dying.
14       MR. VEROFF:  That's fine.  Let's go off the
15  record.
16       THE VIDEOGRAPHER:  The time is 11:10 a.m. and
17  we're off the record.
18       (Recess.)
19       THE VIDEOGRAPHER:  The time is 11:18.  We're on
20  the record.
21       MR. VEROFF:  Mark this document as the next
22  exhibit in line, 192, please.
23       (WHEREUPON, DEPOSITION EXHIBIT 192 WAS MARKED
24       FOR IDENTIFICATION.)
25       MR. PETERSON:  Hold for one second.  Let me

Charles Andrist
October 05, 2017

Page 50

```
 1   just get a cross-reference for you.
 2        (Off the record discussion.)
 3   BY MR. VEROFF:
 4        Q.  Sir, have you --
 5            I'm sorry, has it been marked?
 6        MR. PETERSON:  26.
 7        MR. VEROFF:  Okay.  For the record, this has
 8   also been previously marked as Exhibit 26.
 9        Q.  Sir, is this a memo that you prepared for
10   someone named Janice dated June 23rd, 2009?
11        A.  Yes.
12        Q.  All right.  And the first line says, "I spoke
13   to Kevin of Travelers Select unit."
14            Do you recall if that's the same Kevin we've
15   been talking about during this deposition?
16        A.  Yes.
17        Q.  All right.  So this is Kevin, the underwriters
18   at Travelers?
19        A.  Yes.
20        Q.  All right.  And you note that, it says, "He
21   asked -- Kevin asked we input/quote online."
22            Do you have any recollection of what you meant
23   when you wrote "input/quote"?
24        A.  It was the computer program that you alluded to
25   earlier.
```

Page 51

```
 1        Q.  Travelers Express?
 2        A.  If that's what you called it, yeah.
 3        Q.  The quotation system?
 4        A.  Yes.
 5        MR. PETERSON:  Lack of foundation.  Move to
 6   strike.
 7   BY MR. VEROFF:
 8        Q.  All right.  And so it says --
 9        MR. PETERSON:  I'm sorry, just for clarity,
10   just to the, just to the part where he refers to the
11   name of the program.
12   BY MR. VEROFF:
13        Q.  It says then in your memo, "He suggested you
14   use the four groups of units as 1 through 4 unit code.
15   The other three groups of buildings have five units and
16   use code 5 to 12 units.  Will save some premium."
17            Do you see that?
18        A.  I do.
19        Q.  So that was Kevin of Travelers' suggestion that
20   the policy be written like that?
21        A.  Yes.
22        Q.  Does this refresh your recollection about
23   anything else that you discussed with Kevin on the
24   phone?
25        A.  Well, as I said, I don't remember the specifics
```

Page 52

```
 1   of the conversation because it's over eight years ago.
 2        Q.  Sure.
 3        A.  But I know that I did talk with the Travelers
 4   underwriter.  I reached out because they did not come
 5   back after my initial submission like the other markets
 6   had and I ended up with Kevin because other people were
 7   on vacation.  I would have told Kevin about the changes
 8   on the application because that was the purpose of the
 9   call as well as get the status, if any, on their
10   interest in the risk.
11        MR. PETERSON:  Move to strike the "I would have
12   told Kevin" as speculation.
13        MR. VEROFF:  Oppose.
14        Q.  You would have told Kevin that because, was
15   that your pattern, was that your practice of business,
16   if there was a mistake on an application you submitted
17   to call and clarify it?
18        MR. PETERSON:  Objection --
19        THE WITNESS:  Yes.
20        MR. PETERSON:  -- calls for speculation.
21   BY MR. VEROFF:
22        Q.  I'm sorry, can you repeat it so it's clear on
23   the record.
24        A.  Yes.
25        Q.  Okay.  Thank you.
```

Page 53

```
 1            You also mentioned that by that time,
 2   June 23rd, the other markets had expressed that they
 3   didn't have any interest in the West Overland policy; is
 4   that correct?
 5        A.  No.
 6        Q.  Okay.  By this time had you received any
 7   responses from Allied Insurance about whether they were
 8   interested in business?
 9        A.  There is in the file a memo from the Allied
10   underwriter stating that they would not be able to write
11   the risk because it was not sprinkled, and she also said
12   it was three stories.
13        Q.  And, therefore, you never obtained any quote to
14   solicit to West Overland for an Allied policy, correct?
15        A.  No, that -- when the underwriter turns it down,
16   it stops the process.
17        Q.  Did you ever receive any feedback from any of
18   the surplus lines brokers about whether they had
19   carriers that might be interested in the policy?
20        MR. PETERSON:  Vague as to time.
21        THE WITNESS:  Yes, I did.
22   BY MR. VEROFF:
23        Q.  Do you recall what those responses were?
24        A.  I recall that there are applications that are
25   specific to the surplus lines market that needed to be
```

Charles Andrist
October 05, 2017

Page 162

1 characterization of the witness's testimony. Misstates
2 the facts.
3      MR. VEROFF: Yeah, Mark, he said that was the
4 exact reason he made the call.
5 BY MR. PETERSON:
6      Q. Go ahead.
7      A. Earlier in testimony I did remark that because
8 of eight years I don't remember specifics of the
9 conversation.
10      Q. Fair enough.
11      So at this point Kevin tells you that the
12 application should be submitted through Travelers'
13 online application system; is that right?
14      MR. BETTENCOURT: Objection. The document
15 speaks for itself. Misstates the evidence.
16      THE WITNESS: Yes.
17 BY MR. PETERSON:
18      Q. And that happened on or about June 23 of 2009?
19      A. Yes.
20      Q. And then you gave the quote file to Janice
21 Schultz of INB and directed her to apply online for the
22 West Overland policy to Travelers, correct?
23      MR. BETTENCOURT: Objection; compound.
24 Misstates prior testimony.
25      MR. VEROFF: Yeah, mischaracterizes an

Page 163

1 application.
2      THE WITNESS: I gave the file to her so she
3 would run a quote off of the program that Travelers had
4 directed us to.
5 BY MR. PETERSON:
6      Q. And in order to get a quote, one has to apply
7 for insurance; is that right?
8      MR. VEROFF: Calls for a legal conclusion.
9 Misstates the record. Misstates testimony.
10      MR. BETTENCOURT: Objection; argumentative.
11      THE WITNESS: What came out of the printer was
12 a quote. It wasn't an application for issuance.
13 BY MR. PETERSON:
14      Q. Understood. But what went into the system was
15 Janice putting in the, the prospective insured's name
16 and other information about the property; is that
17 correct?
18      MR. BETTENCOURT: Argumentative. Misstates the
19 testimony. Asked and answered. Getting to the point of
20 harassing.
21      Same objections. Calls for speculation.
22      MR. VEROFF: Join that.
23      THE WITNESS: I believe that the process that
24 Janice went through on the computer was the same I did
25 with the ACORD application that was sent in on the 4th

Page 164

1 of June, that is, here's an application. And she has to
2 put the application that the computer can read by
3 inputting it, then the computer or however your system
4 works, would come out with a quote.
5 BY MR. PETERSON:
6      Q. Okay. Did you stand over Janice as she was
7 entering the information into the web-based system?
8      A. No.
9      Q. No?
10      That wasn't anything you ever did?
11      A. No.
12      Q. That wasn't your job, it was Janice's job for
13 this particular policy?
14      MR. VEROFF: To stand over her shoulder?
15      MR. BETTENCOURT: Argumentative. Vague.
16      THE WITNESS: I did not.
17 BY MR. PETERSON:
18      Q. Okay. Flipping back to Exhibit 12 for a
19 second, in particular the second page there, which is
20 Exhibit 12 Page INB 418. Second page there, INB 418.
21      When you gave Janice the quote file -- no, I
22 think we're still on the wrong exhibit. 12.
23      A. Oh, I'm sorry.
24      Q. Turn one more tab and then one more page so
25 we're on Exhibit 12, Page 418.

Page 165

1      A. (Witness complies.)
2      Q. Are these notes part of what you gave Janice in
3 your quote file together with Exhibit 26 to your
4 transmittal note to her?
5      MR. BETTENCOURT: Objection; calls for
6 speculation. Asked and answered.
7      THE WITNESS: Yes, this would have been in the
8 quote file.
9 BY MR. PETERSON:
10      Q. Okay. And on that page on Exhibit 12, up at
11 the top, it says "Two units sprinklered" and then at the
12 top, it says "19 total." And then to the right --
13      THE REPORTER: I'm sorry, "and then to the
14 right"?
15 BY MR. PETERSON:
16      Q. To the right of "two units sprinklered," it
17 says, "N/W corner."
18      Does that mean that the two units of 19 which
19 are in the northwest corner of the property are the
20 sprinklered ones?
21      MR. BETTENCOURT: Objection; document speaks
22 for itself.
23      THE WITNESS: That's my understanding.
24 BY MR. PETERSON:
25      Q. Okay. According to what you had been told,

Page 170

1    really tell you what was on her mind.
2    BY MR. PETERSON:
3        Q.   Okay.
4        A.   But if it was partially sprinklered and she saw
5    the term "sprinklered," maybe that's why she checked it.
6        Q.   Move to strike as speculation.
7        A.   Okay.  That's fair.
8        Q.   Fair is fair.
9             The next page, 148 is the same result for the
10   second building.  The second building location is
11   highlighted and it says the sprinkler box is checked.
12   The next page 149, the third building is highlighted and
13   the sprinkler box is checked.  And the next page 140 --
14   150 for the fourth location the sprinklered box is
15   checked.
16             Having reviewed those four pages, same -- you
17   can't help us understand why Janice would have checked
18   sprinkler four times?
19            MR. BETTENCOURT:  Objection --
20            MR. VEROFF:  Asked and answered.  Document
21   speaks for itself.
22            MR. BETTENCOURT:  Argumentative.
23   BY MR. PETERSON:
24       Q.   If you don't know, you don't know.
25       A.   I don't know.

Page 171

1        Q.   In June of 2009, did anybody from INB walk out
2    to the property in the process of applying for
3    insurance?
4             MR. BETTENCOURT:  Objection; calls for
5    speculation.
6             MR. VEROFF:  Vague and ambiguous.
7             THE WITNESS:  I did mention in one of the memos
8    to Jennifer Chen did she have any additional pictures.
9    And if she didn't, then someone from the agency would
10   have gone out and taken pictures.  But the pictures were
11   supplied by Jennifer Chen so no one visited the risk.
12   BY MR. PETERSON:
13       Q.   That's not surprising to you, is it?
14            MR. BETTENCOURT:  Objection.
15   BY MR. PETERSON:
16       Q.   That nobody from INB went out to inspect the
17   property?
18            MR. BETTENCOURT:  Objection; vague, overbroad.
19            THE WITNESS:  I don't believe that it was
20   necessary, at least at the time, to go look at it.  It
21   was 19 units that, made to look like townhomes and it
22   was new construction.
23            And believe it or not, I don't think anybody
24   could have thought about the problems that are here
25   today.

Page 172

1    BY MR. PETERSON:
2        Q.   So as you sit here today, you don't think to
3    yourself, wow, we should have gone out and inspected the
4    property?
5             MR. BETTENCOURT:  Objection.  He's here to
6    testify about what occurred in 2009, not to give his
7    opinion as to what should have occurred in 2009.
8             MR. VEROFF:  Argumentative, harassing.  There's
9    no foundation he reported anything incorrect about the
10   property.
11            THE WITNESS:  The fact that we didn't look at
12   the risk wasn't important at the time in 2009 because I
13   had pictures.  I spoke with the developer.  I spoke with
14   somebody in real estate or something like this and we
15   shared firsthand knowledge of the risk itself.  And I
16   was trying to be accurate with the carriers and so I
17   didn't think a visit to the risk would be necessary.
18   BY MR. PETERSON:
19       Q.   You would agree that when you described four
20   different buildings and you say sprinklered,
21   sprinklered, sprinklered, sprinklered on four different
22   buildings, something is inaccurate even if two of the
23   19 units are sprinklered because the most number of
24   buildings that could have any sprinklers would be two of
25   the four buildings, right?

Page 173

1             MR. BETTENCOURT:  Objection; compound,
2    incomplete hypothetical, assumes facts, lacks
3    foundation.  Vague and ambiguous as to the term
4    "sprinklered."
5             MR. VEROFF:  Misstates the record.
6             THE WITNESS:  I'm sorry, you'll have to repeat.
7             THE REPORTER:  "You would agree that when
8             you described four different buildings
9             that [sic] you say sprinklered,
10            sprinklered, sprinklered, sprinklered on
11            four different buildings, something is
12            inaccurate even if two of the 19 units are
13            sprinklered because the most number of
14            buildings that could have any sprinklers
15            would be two of the four buildings,
16            right?"
17            MR. BETTENCOURT:  Same objections.
18            THE WITNESS:  I think that there was a
19   misunderstanding as to the term, also the term
20   "sprinklered."  There's a good possibility she didn't
21   understand what sprinklered meant as far as is it
22   partially sprinklered, is it not sprinklered, is it
23   fully sprinklered.  And, but I don't know what was in
24   her mind.
25   /

Charles Andrist
October 05, 2017

Page 174

BY MR. PETERSON:

2    Q.  By any definition of sprinklered, though, isn't
3  it fair to say that the information on the application
4  is not accurate because not even four units were
5  sprinklered?

6        MR. BETTENCOURT:  Objection; vague,
7  argumentative, incomplete hypothetical, compound.  Vague
8  and ambiguous as to "sprinklered."  Asked and answered.

9        THE WITNESS:  Her, her interpretation was
10  probably that the, the, part of it was sprinklered so
11  she checked all the boxes, but I don't know.

12        MR. VEROFF:  Move to strike.  Speculation.

13  BY MR. PETERSON:

14    Q.  Okay.  Exhibit 28, if you would.

15    INB 349.  You sent this email to Ms. Chen on
16  June 24, 2009; is that correct?

17    A.  Yes.

18    Q.  "We just got a Travelers Insurance quote.  I'll
19  FAX it to you this morning."

20    You sent that to her, correct?

21    A.  Yes.

22    Q.  And then did you on June 24th or June 25th FAX
23  her the, the Travelers quote?

24    A.  Is there a document that shows that?

25    Q.  The next page helps us with that.  That's

Page 175

1  Exhibit 29.  June 24, 2009, FAX to her.  This is just a
2  one-page FAX cover sheet dated June 24, 2009.

3        "Dear Jennifer, please find our quote enclosed
4  for your review."

5    Did you send Jennifer Chen a FAX with the
6  Travelers quote for insurance on the West Overland
7  property on June 24, 2009?

8        MR. BETTENCOURT:  Objection; the document
9  speaks for itself.

10        THE WITNESS:  I believe I did.

11        MR. BETTENCOURT:  I'm sorry, my computer's
12  dying again.  Can we take another break?  I've got to
13  grab the cord for it.

14        THE VIDEOGRAPHER:  The time is 3:30 p.m.  We're
15  off the record.

16        (Recess.)

17        THE VIDEOGRAPHER:  The time is 3:44 p.m.  We're
18  on the record.

19  BY MR. PETERSON:

20    So, Mr. Andrist, with Exhibit 29, the June 24,
21  2009, FAX, you sent over a quote from Travelers to
22  Ms. Chen; is that right?

23    A.  Yes.

24    Q.  Okay.  And please look at Exhibit 32 --

25    A.  Well, also this is what I was referring to

Page 176

1  earlier in my testimony where the discussions that I had
2  with Kevin show up in my, in my FAX to Jennifer, if
3  that's of interest to you.

4        It's No. 1, which is, "Insurance carriers do
5  not like vacant properties.  Please get occupancy for
6  the units very soon.  Insurance carrier understands you
7  plan to rent out the units versus sell them off."

8        And that was the thing that I was concerned
9  about is why I went also to the E&S brokers.  So it, it
10  is just showing that we did have a, an on-running
11  conversation.

12        And also just so you, I, I, I'm presuming you
13  understand, but when an agent talks with an underwriter,
14  it's a two-way conversation.  It is responsibility of
15  the underwriter to ask questions about the risk so he
16  understands that it fits his employer's appetite.

17        And so one of the jobs as an underwriter is to
18  screen applications to see, yes, this fits and, no, this
19  does not.  Kind of like the Allied underwriter did.  And
20  so the agent is there to give as much information as
21  possible, but conversely, the underwriter has got the
22  responsibility to also ask questions.  So Kevin wasn't
23  just listening, he was talking to me.

24        MR. PETERSON:  Move to strike everything after
25  the first word of the yes-or-no question.

Page 177

1    Q.  Just take a look at Exhibit 32.

2    Did you receive this back from Ms. Chen on
3  June 25, 2009, after sending her the Travelers quote?

4        MR. BETTENCOURT:  I'll object that we're just
5  looking at it, what seems to be just a portion of the
6  document.

7        THE WITNESS:  It says June 24th.  I'm not sure
8  which one -- it says to June 24th, so maybe it was
9  June 24th sending and June 24th sending back or
10  something.

11  BY MR. PETERSON:

12    Q.  Right.  Or could be June 25th because that's
13  the date of Ms. Chen's signature down toward the bottom?

14    A.  Yes.

15    Q.  So fair to say that on June 24 or June 25
16  Ms. Chen sent this back to INB?

17        MR. BETTENCOURT:  Objection.  Again, we're just
18  looking at a portion of a document.  It's confusing to
19  the witness.  And the document speaks for itself.

20        THE WITNESS:  I believe that this is her
21  signature and she sent it back to me.

22  BY MR. PETERSON:

23    Q.  On June 24 or June 25?

24        MR. BETTENCOURT:  Same objections.

25        THE WITNESS:  Yes.

Charles Andrist
October 05, 2017

Page 178

```
 1  BY MR. PETERSON:
 2      Q.  And what happened next?
 3          MR. BETTENCOURT:  Objection; calls for a
 4  narrative, vague and ambiguous.
 5          THE WITNESS:  You mean next from this or
 6  next --
 7  BY MR. PETERSON:
 8      Q.  As, as a result of getting Exhibit 32, what did
 9  you do, if anything?
10          MR. BETTENCOURT:  Objection; overbroad.
11          THE WITNESS:  It would have been given to the
12  customer service rep because at that time she was in
13  possession of the file.
14  BY MR. PETERSON:
15      Q.  And that's Janice Schultz?
16      A.  Yes.
17      Q.  And what did Janice Schultz next do, if you
18  know?
19      A.  I don't.
20      Q.  Okay.  Did somebody from INB -- as a result of
21  getting Exhibit 32 -- reach out to Travelers and ask
22  that it issue the policy?
23          MR. BETTENCOURT:  Objection; vague and
24  ambiguous as to issue.  Calls for speculation.
25          THE WITNESS:  I would say that's accurate
```

Page 179

```
 1  because the policy was, was developed.
 2  BY MR. PETERSON:
 3      Q.  The policy was issued?
 4      A.  Yeah.
 5          MR. BETTENCOURT:  Objection; calls for
 6  speculation, vague and ambiguous as to issued.
 7          MR. VEROFF:  Join.
 8  BY MR. PETERSON:
 9      Q.  And the policy was issued by Travelers, the
10  company in this case; is that right?
11          MR. BETTENCOURT:  Objection; misstates the
12  evidence.  Vague and ambiguous as to issue.
13          MR. VEROFF:  Join.
14          THE WITNESS:  Yes, it was a Travelers policy.
15  BY MR. PETERSON:
16      Q.  Yes.  And the only person who could issue a
17  Travelers policy is Travelers, in your understanding;
18  was that correct?
19          MR. BETTENCOURT:  Objection; mischaracterizes
20  the evidence.  Vague and ambiguous as to issue.  Calls
21  for speculation.  Calls for legal conclusion.
22          MR. VEROFF:  Join.
23          THE WITNESS:  Yes.
24  BY MR. PETERSON:
25      Q.  Exhibit 36 is a copy of the policy, according
```

Page 180

```
 1  to the records, of West Overland.  It's what West
 2  Overland produced in this case.
 3      Q.  Are you able to identify this as the policy?
 4          MR. BETTENCOURT:  Objection; calls for
 5  speculation.  Assumes facts.
 6          MR. VEROFF:  Join.
 7          THE WITNESS:  I have never seen the policy.
 8  BY MR. PETERSON:
 9      Q.  To this day you've never seen the policy before
10  today?
11          MR. BETTENCOURT:  Objection; asked and
12  answered.
13          THE WITNESS:  In all of the file documents, the
14  things that I looked at were the quote-up, not the
15  actual policy that was issued because I never saw it.
16  BY MR. PETERSON:
17      Q.  So in this particular case in June of 2009,
18  late June of 2009, where did the physical policy turn to
19  paper and get delivered?
20          MR. BETTENCOURT:  Objection; vague and
21  ambiguous.  Unintelligible.
22          MR. VEROFF:  Join.  Calls for speculation.
23          THE WITNESS:  If I understand your question, it
24  is my understanding, because I never saw the policy, but
25  it's my understanding that Travelers mailed the original
```

Page 181

```
 1  policy direct to the insured West Overland, Jennifer
 2  Chen, and the agency received what is a reduced policy,
 3  fewer pages.  They don't have all the endorsements.
 4  They just have pages that show coverages and an
 5  endorsement page.  And that was the, the policy copy
 6  that the agency got, which I didn't see either.
 7  BY MR. PETERSON:
 8      Q.  And what makes you sure of that?
 9      A.  There's a process that we have in the agency
10  that this -- and as far as I know, we, the agency always
11  received at least the first year's new business original
12  policy.  On renewals, often the carriers will send the
13  policy direct on a renewal.  But the first new business
14  year, the agency, as far as I know, always got a copy --
15  the original policy and a copy for the agency.
16          And we have a process or did have a process in
17  the agency where all policies that came in on the mail
18  were set aside and then a list would be made for those
19  policies.  And it would have the name of the insured,
20  the date it was received in the agency, the, probably
21  the, I don't remember exactly, but probably the
22  effective dates of the policy, and the carrier.  And
23  there was a section for initialling.
24          And so once it was banded and put on a certain
25  table in the agency, anybody that wanted to take that
```

# EXHIBIT "C"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA


WEST OVERLAND, LLC, A
CALIFORNIA LIMITED
LIABILITY COMPANY,

       Plaintiff,

  vs.               CASE NO. RG16837763

TRAVELERS CASUALTY
INSURANCE COMPANY OF
AMERICA, A CONNECTICUT
CORPORATION; AND INB
INSURANCE SERVICES
CORP., A CALIFORNIA
CORPORATION,

       Defendants.

_____


VIDEOTAPED DEPOSITION OF PERSON MOST KNOWLEDGEABLE

CRAIG HULSE

Tuesday, July 25, 2017

9:19 a.m.


180 Grand Avenue

Oakland, California


REPORTED BY:

Diane Dearmore

CSR No. 12736

## Page 2

```
 1  APPEARANCES:
 2
 3      For Plaintiff:
 4      KERR & WAGSTAFFE, LLP
        DANIEL J. VEROFF, ATTORNEY AT LAW
 5      101 Mission Street, 18th Floor
        San Francisco, California  94105
 6      (415) 371-8500
        veroff@kerrwagstaffe.com
 7
 8      For Defendant Travelers Casualty Insurance Company
        of America, a Connecticut Corporation:
 9
        CATES PETERSON, LLP
10      MARK D. PETERSON, ATTORNEY AT LAW
        4100 Newport Place, Suite 230
11      Newport Beach, California  92660
        (949) 724-1180
12      mpeterson@catespeterson.com
13
        For Defendant INB Insurance Services Corp., a
14      California Corporation:
15      CRESSWELL, ECHEGUREN, RODGERS & HARVEY, P.C.
        JOSHUA J. BETTENCOURT, ATTORNEY AT LAW
16      180 Grand Avenue, Suite 440
        Oakland, California  94612
17      (510) 444-1735
        jbettencourt@cresswell-law.com
18
        AND
19
        ROBINSON & WOOD, INC.
20      JESSE F. RUIZ, ATTORNEY AT LAW
        227 North First Street
21      San Jose, California  95113
        (408) 298-7120
22      jfr@robinsonwood.com
23
        Also present:
24
        Cyril Suszckiewicz, Videographer
25
```

## Page 3

```
 1           INDEX TO EXAMINATION
 2
 3      WITNESS:  CRAIG HULSE
 4
 5  EXAMINATION                          PAGE
 6  By Mr. Veroff                        9, 306
 7  By Mr. Peterson                      192
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX TO EXHIBITS
 2         PERSON MOST KNOWLEDGEABLE
 3              CRAIG HULSE
 4      West Overland, LLC v. Travelers, et al.
 5            Tuesday, July 25, 2017
 6       Diane Dearmore CSR No. 12736
 7
 8  MARKED          DESCRIPTION              PAGE
 9  Exhibit 73   Re-Notice of Deposition     12
10  Exhibit 74   Notice of Deposition        12
11  Exhibit 75   Objections to Notice        14
12  Exhibit 76   Responses                   24
13  Exhibit 77   Licensee Base Data          30
14  Exhibit 78   Action Notice               30
15  Exhibit 79   Agency Information Form      30
16  Exhibit 80   Declarations                30
17  Exhibit 81   July 5, 2006 letter         46
18  Exhibit 82   November 30, 2006 letter    51
19  Exhibit 83   December 1, 2006 letter     56
20  Exhibit 84   Agency Contract             56
21  Exhibit 85   Apartment PAC               65
22  Exhibit 86   Apartment PAC               65
23  Exhibit 87   Apartment PAC               65
24  Exhibit 88   Apartment PAC               65
25  Exhibit 89   Apartment PAC               65
```

## Page 5

```
 1              INDEX TO EXHIBITS
 2                (CONTINUED)
 3  MARKED          DESCRIPTION              PAGE
 4  Exhibit 90   Apartment PAC               65
 5  Exhibit 91   Apartment PAC               65
 6  Exhibit 92   Apartment PAC               65
 7  Exhibit 93   Agency Contract             77
 8  Exhibit 94   New Business Override Agreement  83
 9  Exhibit 95   Collection of documents     85
10  Exhibit 96   Commercial Insurance Application  88
11  Exhibit 97   Handwritten notes           95
12  Exhibit 98   Proposal                    100
13  Exhibit 99   Handwritten notes           101
14  Exhibit 100  Fax                         104
15  Exhibit 101  Fax cover sheet             109
16  Exhibit 102  Underwriting information    111
17  Exhibit 103  Product Guide               118
18  Exhibit 104  Commercial Insurance Application  129
19  Exhibit 105  Policy Summary              135
20  Exhibit 106  TravelersExpress guide      140
21  Exhibit 107  IENet Updates               144
22  Exhibit 108  TravelersExpress guide      147
23  Exhibit 109  Screen shots                148
24  Exhibit 110  Screen shots                151
25  Exhibit 111  Master PAC Apartment        153
```

Page 170

1    hand you what's been marked as Exhibit 117. It's INB
2    1069 through 1070. Do you recognize these as
3    handwritten notes from you?
4        A.    Yes.
5        Q.    Do you see on the first page it says Kevin
6    McCormick, 11-9 or 4, or something, dash 16?
7        A.    Yes.
8        Q.    Do you recall having a conversation with
9    someone named Kevin McCormick on that date?
10       A.    I believe so, yes.
11       Q.    Do you remember who Kevin McCormick is?
12       A.    I was trying to get a copy of the fire report
13   so I could find out what was going on. And I don't know
14   if Kevin McCormick is from ATF. I don't know if he's
15   from the Alameda Fire Department. I don't know where
16   he's from, but there's two different fire departments
17   that were doing reports. And I was trying to get
18   copies, and I was having a tough time getting those
19   copies.
20       Q.    Gotcha. Can you turn to the next page? And
21   you see that there is a reference to a telephone call
22   with Dawn Lucia?
23           MR. BETTENCOURT: Objection. Assumes facts.
24           MR. PETERSON: Join.
25           THE WITNESS: All right.

Page 171

1        Q.    (By Mr. Veroff) Do you have any -- well,
2    first of all, can you explain to me what your notes say
3    here? I can't quite read them all.
4        A.    Dawn at Travelers. I called for status on
5    West Overland claim. Denying coverage. She denied the
6    claim. Stated -- I don't know -- status, where she got
7    her information. Attorney for insured wanted to talk to
8    claims -- looks like rep, Dawn. No date on the building
9    of origin. Travelers, where are fire sprinklers -- I
10   think they were going to go out and look at the
11   building, location on fire sprinklers, but apparently
12   couldn't find any sprinklers.
13       Q.    Okay. You can set that document aside. I'll
14   hand you what's been marked as 118. We're almost done,
15   guys. This is INB 887 -- actually, you know what?
16   These pages are a bit out of order, but it does run from
17   INB 883 to INB --
18           MR. PETERSON: Did you misstate?
19           MR. VEROFF: -- 887.
20           MR. PETERSON: Do it again.
21           MR. VEROFF: INB 883 to INB 888.
22           MR. PETERSON: Oh, just out of order, but
23   those are the numbers?
24           MR. VEROFF: Yes.
25           MR. PETERSON: Okay.

Page 172

1        Q.    (By Mr. Veroff) Do you recognize these as
2    more handwritten notes from yourself?
3        A.    Yes.
4        Q.    All right. And do you see on the first page,
5    there's a reference to a call with someone named Mark?
6    Do you see that, or --
7        A.    Yes.
8        Q.    Does it say a last name that you can read?
9        A.    No, I don't -- I don't know what his last name
10   is there.
11       Q.    All right. Do you have any recollection of
12   your conversation with Mark? Is it, perhaps, Mark
13   Holmes?
14       A.    I don't know. It could be.
15       Q.    Do you recall having a conversation with
16   anyone named Mark Holmes?
17       A.    No, I don't. Not off the top of my head, no,
18   not that I recall.
19       Q.    Can you turn to the fourth page of the
20   document? Can you read what that says?
21       A.    It says, Call Angela.
22       Q.    Does it refer to a call that happened, or is
23   it a note to make a call to someone named Angela?
24       A.    I think it's probably something that got stuck
25   in there by mistake. Angela is one of my outside

Page 173

1    salespeople. It has nothing to do with the claim.
2        Q.    Okay.
3        A.    I don't remember anybody by the name of Angela
4    at this point in time that relates to this claim.
5        Q.    Okay. You can set that aside. Handing you
6    what's been marked as 119, INB 992 to 943, as well as
7    944 and 945. Do you recognize these as additional
8    handwritten notes from you?
9        A.    Yes.
10       Q.    Do you see it says on the first page, 7/25/16,
11   called Mike King, Travelers?
12       A.    Yes.
13       Q.    Who is Mike King?
14       A.    He is the current underwriter at Travelers.
15       Q.    Do you have any recollection of what was
16   discussed during that conversation?
17       A.    Not that particular one. I do know that I was
18   after him to: This endorsement shouldn't be on there,
19   it shouldn't have ever been on there, take it off.
20       Q.    All right. You can set that aside.
21           (EXHIBIT NO. 120 MARKED.)
22       Q.    (By Mr. Veroff) I'll hand you what's been
23   marked as Exhibit 120. It's INB 968 to 969. Do you
24   recognize the email on the top as an email from you
25   dated July 12, 2016 to Dawn Lucia and Gary wells?

Craig Hulse
July 25, 2017

Page 174

1    A.    Yes.
2    Q.    And do you see you're saying that, I believe
3  the sprinkler exclusion was put on in error?
4    A.    Yeah, correct.
5    Q.    Are you referring to the protective safeguard
6  endorsement in the policy for sprinklers?
7    A.    Yes.
8    Q.    Do you still believe it was added in error?
9    A.    I do, yes.
10   Q.    Why do you think it was added in error?
11        MR. BETTENCOURT:  I'm going to object under
12  Rifkind versus Superior Court to the extent you're
13  asking him to support a legal contention.
14   Q.    (By Mr. Veroff)  Sitting here today, what
15  information were you basing your statement here on, that
16  you believe the sprinkler exclusion was put in in error?
17        MR. BETTENCOURT:  Same objection under
18  Rifkind.
19        THE WITNESS:  I don't think the sprinkler
20  exclusion should have been on there.  It's one partial
21  sprinkler, and I just didn't think it should be on
22  there.
23   Q.    (By Mr. Veroff)  Do you think that INB made
24  any mistakes that caused that exclusion to be part of
25  the policy?

Page 175

1        MR. BETTENCOURT:  Objection.  Vague and
2  ambiguous.  Calls for a legal conclusion.  Also asking
3  him to support legal contentions -- or facts supporting
4  legal contentions.
5        THE WITNESS:  I think we submitted the
6  application.  We disclosed everything we knew.  And
7  that's all I can pretty much tell you about that.
8    Q.    (By Mr. Veroff)  And Travelers ultimately
9  denied West Overland's claim, correct?
10   A.    They did, yes.
11   Q.    And they denied it because of the sprinkler
12  exclusion?
13   A.    Yes, they did.
14   Q.    Do you believe their position was correct?
15        MR. PETERSON:  Objection.  Calls for a legal
16  conclusion.
17        THE WITNESS:  My personal opinion is I think
18  it should have been -- the exclusion should not have
19  been on there.  That's just my opinion.
20   Q.    (By Mr. Veroff)  Do you think Travelers should
21  have paid this claim?
22        MR. PETERSON:  Misstates the testimony.  Calls
23  for a legal conclusion.
24        MR. BETTENCOURT:  Objection --
25        MR. PETERSON:  Incomplete hypothetical.

Page 176

1        MR. BETTENCOURT:  -- you're also inquiring as
2  to legal contentions, and this is not the proper format
3  for doing that.
4        THE WITNESS:  I'm not a claims adjustor.  I
5  can't answer how they would have settled it, so --
6    Q.    (By Mr. Veroff)  Was there ever a request by
7  INB that Travelers reform the insurance policy to remove
8  the endorsement for sprinklers?
9        MR. BETTENCOURT:  Objection.  The documents
10  speak for themselves.
11        THE WITNESS:  Are you saying that they
12  shouldn't have issued the exclusion?  Is that what
13  you're saying, or what are you trying to say there?
14   Q.    (By Mr. Veroff)  Have you ever heard of the
15  concept of policy reformation?
16   A.    Maybe under a different term, but --
17   Q.    When an insurance company will make a decision
18  to remove or add something to a policy that's been
19  issued or changed, something about it to comply with
20  what the party has actually intended.
21   A.    I thought that's what I was originally asking
22  for, but I don't know.  I didn't use that terminology.
23   Q.    And Travelers refused to do so?  Is that --
24   A.    Yeah, they did not take off the exclusion.
25   Q.    Did they ever explain to you why they weren't

Page 177

1  going to take it off?
2    A.    No.
3    Q.    Did they ever explain to you that they
4  believed INB committed an error that was the reason they
5  issued the sprinkler endorsement?
6        MR. BETTENCOURT:  Objection.  Assumes facts.
7        THE WITNESS:  I don't know.  I'd have to take
8  a look at their denial letter and see what it says.
9    Q.    (By Mr. Veroff)  Has Travelers asked INB to
10  indemnify it for this lawsuit?
11   A.    I know we got something as relates to that,
12  but I don't know for sure.  I think they have, but I
13  don't know.
14   Q.    Has Travelers told INB that it believes the
15  reason it's being sued in this lawsuit is because of
16  INB's mistake?
17   A.    I don't know.  I'd have to ask my counsel on
18  that.  I turned it over to him.  I didn't look at it
19  that close.
20   Q.    Do you believe Travelers should have done
21  something differently in handling this claim?
22        MR. PETERSON:  Lack of foundation.  Calls for
23  a legal conclusion.
24        MR. BETTENCOURT:  Objection.  Vague and
25  ambiguous.

Craig Hulse
July 25, 2017

Page 194

1    A.    Not all the time --
2         MR. BETTENCOURT:  Objection --
3         THE WITNESS:  When I first started out, I was
4    just a clerk filing and that kind of stuff.
5         MR. BETTENCOURT:  You need to just let me make
6    the objection.  Objection.  Assumes facts as to
7    "broker."  Vague and ambiguous.
8    Q.    (By Mr. Peterson)  But it is true since the
9    '70s?
10   A.    Yes.
11   Q.    What is an insurance broker, to your
12   understanding?
13   A.    Well, right now, it's my understanding that
14   insurance brokers and agents obtain a license now.  If
15   you're a broker, you're acting just on behalf of the
16   client only and securing coverage.  That's a very short
17   descript answer (sic).
18   Q.    Did you personally have a relationship with
19   Jennifer Chen -- a business relationship with Jennifer
20   Chen in 2009?
21   A.    No.
22   Q.    That was through your then business colleague,
23   Chuck -- Charles Andrist?
24   A.    Yes.
25   Q.    And when did Mr. Andrist retire?

Page 195

1    A.    Oh, I want to say it was January 2010,
2    somewhere in that neighborhood.
3    Q.    How old are you?
4    A.    I'm 62.
5    Q.    And Mr. Andrist is older than you are?
6    A.    He's 10 years older.
7    Q.    Okay.  So he's 72?
8    A.    He is.
9    Q.    Okay.  Do you know his address?
10   A.    I don't know it off -- I know he lives in
11   Lincoln.  I can get it for you, but I don't know it off
12   the top of my head, no.
13   Q.    Lincoln, Nebraska?
14   A.    No.  Lincoln over outside of Sacramento.
15   Q.    Okay.  Is he living the life of a retired
16   person, whatever that means?
17        MR. BETTENCOURT:  Objection -- objection.
18   Vague and ambiguous.
19        (By Mr. Peterson)  What does Mr. Andrist do
20   these days?
21   A.    He looks after his grandkids, and I think he's
22   not working.
23   Q.    Okay.  Is he still sharp?
24   A.    Seems to be to me.
25   Q.    Okay.

Page 196

1    A.    I try to have lunch with him every couple of
2    months if I can.
3    Q.    Okay.  So Ms. Chen had a relationship -- and
4    when I say "relationship," I just mean business
5    relationship -- with Mr. Andrist in 2009, correct?
6    A.    Correct.
7    Q.    And that was -- Mr. Andrist was Ms. -- was
8    INB's connection to Ms. Chen; is that correct?  In other
9    words, Ms. Chen came into INB through Mr. Andrist,
10   correct?
11   A.    I don't know how she came to INB, but in 2009
12   he was dealing with her.
13   Q.    Anybody else dealing with her in 2009?
14   A.    Not that I'm aware of.
15   Q.    Okay.  The documents indicate that she
16   contacted Mr. Andrist in late May or early June of 2009,
17   and asked for insurance coverage for this new purchase,
18   correct?
19   A.    Yes.
20   Q.    And if I say "the property," you'll understand
21   today that we're only referring to the one property at
22   1000 through 1036 Agpar (sic) Street in Oakland,
23   correct?
24   A.    I don't know if that's the right
25   pronunciation, but, yes, I know what you're talking

Page 197

1    about.
2    Q.    If you have a better one, I'm all ears.
3    A.    No, that's okay.  Close enough.
4    Q.    And, of course, West Overland, I'm referring
5    to the Plaintiff in this case, West Overland, LLC.  And
6    if I just refer to INB, you understand that I am
7    referring to INB Insurance Services Corp.?
8    A.    All right.
9    Q.    If you think we need clarification to INB the
10   entity, just tell me we need to clarify that.
11   A.    All right.
12   Q.    Okay.  And how much time did you spend
13   preparing for the deposition here today?
14   A.    An hour or so.  I just reviewed the documents
15   that were in my agency file.
16   Q.    Okay.  Did you consider having Mr. Andrist be
17   the designee for INB here today?
18   A.    He's not part of the corporation, so I didn't
19   do that.
20   Q.    Sometimes your answers are going to be "I
21   don't know."  And, of course, if that's the truth, then
22   that's the right answer and we move on to the next
23   thing.  Right?  So never hesitate.  If that's the
24   truthful answer, then give that answer.
25   A.    All right.

Craig Hulse
July 25, 2017

Page 302

1    So using "bind coverage" to mean in that sense
2  of like making coverage effective, here Travelers --
3  what you just pointed out on Exhibit 36 -- issued the
4  first policy on June 25, 2009, the very, very, very same
5  day that Ms. Chen asked for coverage to be issued and
6  effective the very day she wanted it to be bound --
7    A.   You're misstating it.
8    Q.   Let me finish the question, then you can help
9  correct it.
10   At any point did INB for the 2009 policy need
11 to make coverage effective on its own without Travelers
12 issuing a policy?
13   MR. VEROFF:  Incomplete hypothetical.  Lacks
14 foundation.  Confusing.  Compound.
15   MR. BETTENCOURT:  Vague and ambiguous.
16 Unintelligible.
17   MR. VEROFF:  Join.  It's unintelligible.
18   THE WITNESS:  According to her memo, she said
19 bind it on the 29th.  We must have given instruction to
20 Travelers to issue it because they issued it on the 25th
21 for an effective date the 29th.  It's a logical
22 conclusion I can come to.
23   MR. PETERSON:  Can I have the answer read
24 back?  We may be done with the question.
25   (Requested material was read back.)

Page 303

1    Q.   (By Mr. Peterson)  If in 2009 you had been on
2  this account and had noticed the sprinkler endorsement,
3  would you have done something to take it off?
4    MR. BETTENCOURT:  Objection.  Incomplete
5  hypothetical.  Assumes facts.
6    THE WITNESS:  Well, I can't say I would
7  because I wasn't working the account at the time, so I
8  can't.
9    Q.   (By Mr. Peterson)  If Mr. Andrist had noticed
10 it in 2009, would you have -- would you expect that he
11 would have asked Travelers to change --
12   A.   Would I hypothetically extrapolate that?  No,
13 I'm not going to do that.
14   Q.   You can't answer the question then?
15   A.   No, I cannot answer the question.
16   Q.   Is there any indication in this file that
17 Jennifer Chen or anyone from West Overland ever objected
18 to the terms of the policy?
19   MR. BETTENCOURT:  Objection.  It's an improper
20 question in deposition.  If you want supporting facts,
21 you should do that through an interrogatory.
22   Q.   (By Mr. Peterson)  Let me ask it slightly
23 differently.
24   Are you aware if Ms. Chen or anyone for West
25 Overland ever having objected to the terms of the policy

Page 304

1  before the fire?
2    MR. BETTENCOURT:  Same objection.
3    MR. VEROFF:  Vague and ambiguous.  Overbroad.
4    THE WITNESS:  I didn't see a memo in the file
5  to that effect.
6    Q.   (By Mr. Peterson)  You have no information
7  along those lines from any other source?
8    A.   No, I do not.
9    Q.   Is it true that the property at the time of
10 the fire didn't meet the condition of the fire sprinkler
11 endorsement?
12   MR. BETTENCOURT:  Objection.  Calls for a
13 legal conclusion.
14   THE WITNESS:  I'm not an adjustor.  I can't --
15   MR. VEROFF:  Join.
16   THE WITNESS:  -- answer that.
17   Q.   (By Mr. Peterson)  Are you aware of anyone at
18 Travelers ever telling anyone at INB that the fire
19 sprinkler endorsement doesn't mean what it says?
20   A.   Doesn't mean what it says?
21   Q.   Right.
22   MR. BETTENCOURT:  Objection.  Vague and
23 ambiguous.
24   MR. VEROFF:  Join.  Unintelligible.
25   Q.   (By Mr. Peterson)  You're not aware of anyone

Page 305

1  at Travelers ever telling anyone at INB that?
2    A.   I'm not aware.  It doesn't mean it didn't
3  happen.  I'm not aware of it.
4    Q.   To the best of your knowledge, have all the
5  documents requested on Exhibit 74, Travelers' notice of
6  taking deposition, been produced by INB in this case?
7  And you're welcome to confer with counsel about that.
8    MR. VEROFF:  Overbroad question.  It's a
9  meet-and-confer issue.  It sounds like a waste of time
10 for the court reporter and videographer.
11   MR. PETERSON:  We have the witness here in the
12 chair, so this is my chance to ask him.
13   MR. VEROFF:  Can I have the question read
14 back?
15   (Requested material was read back.)
16   MR. VEROFF:  It's an improper deposition
17 question, unless you're asking him if he knows of any
18 specific documents that have not been produced.  If
19 you're asking him to go through the request, it's a huge
20 waste of time and it's a matter for a meet-and-confer.
21   MR. BETTENCOURT:  And I will also advise
22 Counsel that we did serve objections to Travelers'
23 notice for taking deposition, as well as Travelers'
24 request for documents.  So we would instruct you to
25 refer to those objections.

# EXHIBIT "D"

Jennifer Chen
July 21, 2017

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

WEST OVERLAND LLC, a California            )
limited liability company,                )
                                          )
              Plaintiffs,                  )
                                          )
vs.                                       ) No. RG 16837763
                                          )
TRAVELERS CASUALTY INSURANCE COMPANY      )
OF AMERICA, a Connecticut corporation;    )
INB INSURANCE SERVICES CORP., a           )
California corporation,                    )
                                          )
              Defendants.                  )
_____ )

DEPOSITION OF PERSON MOST KNOWLEDGEABLE

JENNIFER CHEN

July 21, 2017

11:09 a.m.

101 Mission Street, 18th Floor

San Francisco, California

REPORTED BY:

Dawn A. Stark

CSR No. 7847

Jennifer Chen
July 21, 2017

Page 2

APPEARANCES:

For Plaintiffs:

KERR & WAGSTAFFE
BY:  DANIEL J. VEROFF, ESQ.
101 Mission Street, 18th Floor
San Francisco, California 94105
415.371.8500
veroff@kerrwagstaffe.com

For Defendant Travelers Casualty Insurance Company of
America:

CATES PETERSON LLP
BY:  MARK D. PETERSON, ESQ.
4100 Newport Place, Suite 230
Newport Beach, California 92660
949.724.1180
mpeterson@catespeterson.com

For Defendant INB Insurance Services Corp.:
CRESSWELL, ECHEGUREN, RODGERS & HARVEY
BY:  JOSHUA J. BETTENCOURT, ESQ.
180 Grand Avenue, Suite 440
Oakland, California 94612
501.444.1735
jbettencourt@creswell-law.com

Page 3

INDEX TO EXAMINATION

WITNESS:  JENNIFER CHEN

EXAMINATION                                    PAGE

By Mr. Peterson                                  15

QUESTIONS INSTRUCTED NOT TO ANSWER

PAGE    LINE

66      8

Page 4

INDEX TO EXHIBITS
JENNIFER CHEN
West Overland vs. Travelers, et al.
Friday, July 21, 2017
Dawn A. Stark, CSR No. 7847

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Letter from Travelers Houston Business Center, dated August 28, 2008, Bates No. 3951 INB 01721 | 15 |
| Exhibit 2 | Part of Master Certificated Issued Under Crawley Warren Insurance Services, Inc., regarding Apgar Development Corporation police, dated December 2, 2008, with attachment, Bates Nos. 3951 INB 00443 through 3951 INB 00448 | 15 |
| Exhibit 3 | Email from Chuck Andrist to Jennifer Chen, dated 03 June 2009, with attachment, Bates Nos. 3951 INB 00990 and 3951 INB 00991 | 15 |
| Exhibit 4 | Document headed "Acord Property Section," dated 6-4-09, Bates Nos. 3951 INB 00668 through 3951 INB 00670 | 15 |
| Exhibit 5 | Telecopy Transmission Cover Message from Chuck Andrist to Travelers Insurance, dated 6-4-09, Bates No. 3951 INB 00370 | 15 |
| Exhibit 6 | Telecopy Transmission, dated 6-4-09, from Chuck Andrist to Travelers Insurance, with attachment, Bates Nos. 3951 INB 00972 through 3951 INB 00989 | 15 |

Page 5

INDEX TO EXHIBITS
JENNIFER CHEN
West Overland vs. Travelers, et al.
Friday, July 21, 2017
Dawn A. Stark, CSR No. 7847

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | Telecopy Transmission Cover Message from Chuck Andrist to Britt Paulk Insurance, dated 6-5-09, with attachment, Bates Nos. 3951 INB 00398 and 3951 INB 00397 | 15 |
| Exhibit 8 | Letter from Linda G. Blackman to Chuck Andrist, dated 6-8-2009, Bates No. 3951 INB 00434 | 15 |
| Exhibit 9 | Email from Jennifer Chen to Kenny Tang, et al., dated 8 June 2009, Bates No. 3951 INB 00420 | 15 |
| Exhibit 10 | Email from Andy Swett to Jennifer Chen and Kenny Tang, dated 8 June 2009, with attachment, Bates Nos. 3951 INB 00421 and 3951 INB 00422 | 15 |
| Exhibit 11 | Copy of Urban Bay, with handwritten notes, with attachment, Bates Nos. 3951 INB 00449 through 3951 INB 00452 | 15 |
| Exhibit 12 | Handwritten notes, dated 6-8-09, Bates Nos. 3951 INB 00454 and 3951 INB 00417 through 3951 INB 00419 | 15 |
| Exhibit 13 | Telecopy Transmission Cover Message, dated 6-10-09, with attachment, Bates Nos. 3951 INB 00404 through 3951 INB 00412 | 15 |

Jennifer Chen
July 21, 2017

Page 114

```
1    Q.   And why not?
2    A.   Because it's -- this is 19 individual homes.
3  It's not required by law to have sprinkler, from my
4  understanding.
5         And it's not doable to put the sprinkler back.
6         So what's the issue?
7    Q.   Well, you could have bought insurance that
8  didn't require fire sprinklers.
9    A.   I don't think that was the issue in my mind.
10        I just think Travelers did not want to cover
11 for -- because next door they have fire -- big fire.
12 Maybe it's too much, $30 million, so they don't want to
13 cover additional insurance.
14        That's deep in my mind.
15        I think they're rejecting bad faith, if you want
16 me to say.
17   Q.   Okay.  Did you try, after the fire, to buy
18 insurance that -- you already told me you didn't.
19        You didn't try to buy insurance that didn't
20 require fire sprinklers.
21        What made you decide not to go buy that other
22 insurance that didn't require fire sprinklers?
23        MR. VEROFF:  Calls for attorney-client
24 communications.  Lacks foundation.  Asked and answered.
25 //
```

Page 115

```
1  BY MR. PETERSON:
2    Q.   Can you answer the question of why you didn't go
3  shopping for such coverage after the fire?
4         MR. VEROFF:  Vague and ambiguous.  Calls for
5  attorney-client communications.
6         MR. PETERSON:  If you don't know, you don't
7  know.  If you know, give me your best answer.
8         MR. VEROFF:  Asked and answered.  She's answered
9  it.
10        You can tell him again.
11        THE WITNESS:  Question again?
12        I want to make sure I answer the question
13 correctly, please.
14        MR. PETERSON:  Sure.
15   Q.   After the fire, you told me you didn't do
16 anything to go shopping for insurance that didn't require
17 fire sprinklers?
18   A.   That's correct.
19   Q.   Did you think about doing it and decide not to
20 do it?
21   A.   No.
22   Q.   Did you just not think about it at all?
23   A.   I was thinking Travelers is not cover the
24 current insurance; I may need to acquire other insurance.
25        Not the sprinkler issue, but not -- but not
```

Page 116

```
1  sprinkler issue because I do not think that's an issue.
2    Q.   So you --
3    A.   That's not in my mind, period.
4         I just -- that's -- maybe you ask me question:
5  Did you try to get another insurance?  That's -- they say
6  is client privileged or something --
7         MR. VEROFF:  You've answered the question.
8         THE WITNESS:  Yeah.
9  BY MR. PETERSON:
10   Q.   Take a look at Exhibit 67 (indicating).
11   A.   Okay.
12        (Witness reviewing document.)
13   Q.   Exhibit 67 is marked 70 through 74.
14        This is an email exchange between you and
15 Paul J. Smith, regarding the property, between
16 November 10 of 2016 and November 14 of 2016.
17        MR. VEROFF:  Misstates the document.
18        She's only on one of these emails -- only
19 sending one of these emails.
20        THE WITNESS:  (Reviewing document.)
21 BY MR. PETERSON:
22   Q.   Do you remember the question?
23   A.   What's the question?
24   Q.   Is this an email exchange between you and Paul
25 Smith of Tegner-Miller --
```

Page 117

```
1    A.   Uh-huh.
2    Q.   -- between November 10th, 2016, and
3  November 14th, 2016?
4    A.   Uh-huh.
5    Q.   Yes?
6    A.   Yes.
7    Q.   And Paul J. Smith works for Tegner-Miller
8  Insurance Brokers?
9    A.   Yes.
10   Q.   And why were you communicating with Mr. Smith in
11 November of 2016?
12   A.   Why?
13        Because my insurance -- I call my insurance
14 agent, and he not even answer me.  I need insurance after
15 that time.
16        After we get -- whatever, they don't talk to me.
17        So I -- this is insurance company down in
18 Los Angeles area.  So I know this -- just like -- that's
19 one of the personal insurer for me.
20        So I just say, "Hey, I have problem," you know.
21        So at least I tried to get information.  I don't
22 even know what's the cost -- what's going to reject or
23 something.
24        They not were answering the call.
25   Q.   INB was not answering your call?
```